731 A.2d 1232 (1999)
323 N.J. Super. 67
STATE of New Jersey, Plaintiff-Respondent,
v.
Claus P. SPETH, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 4, 1999.
Decided July 14, 1999.
*1234 Frederic J. Gross, Mt. Ephraim, for defendant-appellant (Mr. Gross and William H. Buckman, Moorestown, attorneys; Susan E. Babb, Mt. Ephraim, of counsel; Messrs. Gross and Buckman, on the brief).
Lisa Sarnoff Gochman, Trenton, for plaintiff-respondent (Peter Verniero, Attorney General, attorney; Ms. Gochman, of counsel and on the brief).
Before Judges LONG, WEFING and CARCHMAN.
*1233 The opinion of the court was delivered by CARCHMAN, J.A.D.
This appeal requires us to determine: a) whether a prosecution for tampering with a witness, N.J.S.A. 2C:28-5a, requires the State to distinguish between tampering with physical evidence or testimony; and b) whether the trial judge committed plain error by failing to include in the jury charge a definition of "knowingly" as "being aware that it is practically certain that defendant's conduct will cause the forbidden result," and "purposely" as taking a "substantial step which is strongly corroborative of the actor's criminal purpose." We answer both questions in the negative and affirm the conviction.
Defendant Claus P. Speth appeals from a conviction for third-degree tampering with a witness, N.J.S.A. 2C:28-5a. Two additional chargesfourth degree tampering with physical evidence, N.J.S.A. 2C:28-6, and fourth degree false swearing, N.J.S.A. 2C:28-2,resulted in a deadlocked jury. These charges remain outstanding.[1] The trial judge sentenced defendant to two years probation and a fine of $125, and a post-judgment motion challenging the verdict was denied.[2]
The facts described at trial are complicated and require extensive exposition. On August 13, 1993, Ronald Puttorak, forty-three years old, was arrested for sexual assault and placed in protective custody in the Essex County Jail. Approximately six hours after the commencement of his incarceration, his lifeless body was found hanging from a cell door. When Geetha A. Natarajan, M.D., an assistant medical examiner, arrived at the scene, the body had been cut down. After requesting a demonstration of how the body was found, Natarajan received an explanation, which she later related:
According to the correction officer, he was found with his back against the door, against the railings, the metal railings of the door, and he had tied the sheet, he had twisted the white sheet into "a ligature."
[He h]ad tied it on one of the rails of the door on one of these cross bars and tied it around his neck and his slide [sic] forward because if he had stood up it will [sic] not cause compression because he's tall and this [sic] cross bars are not that high because of the door of the cell.
So what he did is, in order to compress the neck, in order to hang, he had to slid [sic] his body forward into the cell in the position in which ... you can see the correction officer there by causing compression to the neck by the application of that sheet and sliding forward.
At the medical examiner's office, Natarajan assigned the Puttorak case to Marie Jose Macajoux, M.D., a New York City medical examiner, who was also working part-time as a forensic pathologist at the *1235 New Jersey Office of the State Medical Examiner. After conducting an autopsy and further examinations, Macajoux and Natarajan confirmed that Puttorak's death was a suicide and that the hyoid bone, a bone located in the neck area which would prove critical to this prosecution, did not reveal a fracture. In sum, the hyoid bone was "unremarkable."
In October 1993, an attorney representing the Puttorak family contacted the Essex County Prosecutor requesting to see the prosecutor's file, as well as the State medical examiner's file, with respect to Puttorak's death. At the family's request, defendant examined some evidence at the medical examiner's office.
Defendant, accompanied by a Mr. Harmatz, who defendant identified as a criminologist, and Jeanette Aguilar, a technician in the medical examiner's office, opened the evidence bag and removed Puttorak's organs, which had been preserved in formaldehyde. No one other than defendant handled the neck while in the room, and, except for a brief period when she left to ask for permission for defendant to photograph the exhibit, Aguilar remained in the room with defendant.
Defendant took out the neck last, put it on the counter and photographed it. Six photographs were taken just after he removed the neck from the bag but before he examined it. Aguilar later was shown photographs taken while defendant had examined the neck. Although she was unable to determine whether the neck depicted in the photographs was the Puttorak neck, Aguilar was able to say that the photographs did not depict what she saw later when Natarajan showed her the specimen, specifically a broken hyoid bone.
Aguilar testified that defendant then took the neck "in his hand and examine[d] it by taking his thumbnail and rubbing it and scraping off the tissue on the bone." The tissue that defendant had pushed away with his thumbnail was in the area of the hyoid bone, but Aguilar did not see or hear defendant break or snap the bone.
As defendant used his thumbnail to either scrape or pick at the tissue on the bone, he asked Harmatz to take photographs while he held the neck at different angles. Aguilar estimated that forty photographs were taken. While this transpired, defendant told Harmatz that "`she messed [sic] a fracture.'"
According to Aguilar, defendant said the fracture was on the right side of the hyoid bone. Although Aguilar was standing next to defendant at the time, she did not see the fracture, and defendant did not show it to her. Defendant also said that there was a hemorrhage on the right side. Aguilar did not observe the hemorrhage either.
After defendant had concluded his examination, he returned all the organs to the bag. Aguilar secured the organs, returned the key to her supervisor, Lombardi, and told him that defendant said he found a fracture and hemorrhage on the right side that had been missed.
Aguilar reported the episode with defendant to Natarajan. Natarajan examined the specimen in Lombardi's and Aguilar's presence. She observed that the specimen was different from when the autopsy was conducted insofar as "there was a clearly recognizable fracture of the hyoid bone on the left side" and the "surrounding area of the fracture was devoid of any tissue." Natarajan continued: "The periosteum, which is the membrane that covers over [the hyoid bone], appeared to have been partly scraped, and there was absolutely no hemorrhage in any of the tissue that is adjacent to the fracture area." Both Aguilar and Lombardi observed the hyoid bone fracture but no hemorrhage.
Despite Natarajan's trial testimony about the location of the fracture on the left side of the hyoid bone, she explained that at the time she first examined the bone, she was holding the bone backwards and, as a result, had mistakenly believed the fracture was on the right side, which is the side that defendant said was fractured and had hemorrhage.
*1236 After Natarajan had completed the examination of Puttorak's neck, she wrote a memorandum to Robert Goode, M.D., also an assistant state medical examiner at the time, in which she described the fracture to the hyoid bone as "clearly fresh and artifactual." She defined an artifact as something that "had no real effect to the cause of death because it ... looked like it was fractured after death, or after the specimen was fixed." Natarajan also wrote that she saw no evidence of hemorrhage surrounding the fracture, identifying the fracture's location as the "right greater cornu."
The next day, Goode examined the Puttorak neck. Like Natarajan, Goode found a bloodless fracture on the left side of the hyoid bone, as well as two bloodless fractures of the thyroid cartilage. However, as did Natarajan, Goode initially mistakenly believed the hyoid fracture to have been on the right side.[3] The fracture was not of the type that could be missed by an experienced forensic pathologist.
Goode asked five other pathologists, including Macajoux, to look at the neck and tell him what they saw. At trial, four pathologists testified that they saw a post-mortem fracture of the hyoid bone with no hemorrhage. Goode informed Macajoux that defendant had observed a fracture of the right hyoid bone and that there was hemorrhage. Macajoux saw an "obvious fracture of the hyoid bone." The fracture was not displaced but was "like a hinge fracture." It was located "[s]omeplace between the greater horns and the body of the hyoid bone." She could not remember at the time of trial whether the fracture was on the right or left side. Macajoux saw no hemorrhage.
Goode reported the apparent post-mortem fracture to the Attorney General's office. Clearly, he suspected that the integrity of the specimen had been compromised. Finally, in November, 1993, the Prosecutor's Office ceased cooperating with the Puttorak family attorney.
On January 7, 1994, a certification signed by defendant was submitted in a civil action captioned Estate of Ronald Puttorak v. Essex County Prosecutor's Office. In the certification, defendant stated that he had found a "significant fracture of the hyoid bone ... associated with abundant hemorrhage," which, according to the certification, meant that "the fracture must have occurred while Mr. Puttorak was still alive." The certification further stated that "[t]his type of fracture may occasionally occur in this type of hanging but may also occur in association with other types of violence to the neck."
On April 5, 1994, defendant telephoned Michael Baden, a medical examiner whom defendant had known since the late 1960's, and told Baden of "concerns he had about a specimen of the hyoid bone that had become an issue in his life."[4] Baden summarized the purpose of defendant's call as follows:
The basis for the call in large part was that he felt that the Medical Examiner's Office was making a mistake about the nature of a fracture to the hyoid bone that he had examined for a private case.
And that he felt that if he, Dr. Natarajan... and myself were to go down and look at the specimen together, that we could see that what he was saying was truthful and accurate and that it would resolve the matter without any further litigation.

*1237 I think he explained to me that he was concerned that this was going to go to a grand jury or there was an investigation in process and he wanted to have that stopped, and he felt that if we all agreed that he was correct in what he had seen, that would stop the litigation.
Baden continued:
Yeah. He had said to me also that there was a citizens committee for an effective medical examiner system in New Jersey who are very upsetI have here "who are infuriated by the way that he was being treated," and that this group felt that it was Dr. Natarajan's fault.
And he felt to me that ifand they were making various protests about what was going on and that he felt that if we all agreed, you know, that what he had said was proper, then the litigation could stop that was aimed at him and that this concerned citizens committee would also stop their criticisms of the Medical Examiners Office and of Dr. Natarajan.
Again, according to Baden:
He had asked that if I could arrange a meeting with Dr. Natarajan, that the 3 of us could go down together [and] look at the specimen in question. That we could all probably, he felt, agree that what he was saying was correct and that this, he thought, was his impression, would then stop the litigation against him.
....
And then the, the protests that the citizens committee were making in various ways, I don't know, by contact with political people and with newspapers, the media, would, would all, criticizing the Medical Examiner's Office and Dr. Natarajan, that would also stop.
And again:
Well, the basis as I understood, the reason he had contacted me is because he felt that if the three of us could get together, Dr. Natarajan, himself and myself, I acting as a referee, I have down here "sort of a referee," that he thought that we could all as forensic pathologists look at the specimen  resolve the issues. Show that he wasn't, you know, that he hadn't done what he was accused of and that the attorney general would then drop the litigation, or the investigation into him and that the citizens committee would stop [its] criticism.
Defendant informed Baden that he knew there was an investigation because an assistant attorney general had shown him a certification signed by Natarajan which had accused defendant of breaking the hyoid bone.[5] Baden said that he would pass that information along, though he did not believe it was "something that could be done in any kind of legitimate way."
Baden had no doubt that defendant's original request for a meeting included advising the Attorney General's office of the request. Although Baden was sure that defendant wanted the Attorney General's office to know about the meeting, defendant also told Baden that he wanted to get together "as three professional persons" without an attorney general present.
On another note, defendant told Baden:
Yeah. He had indicated ... toward the end of that conversation, he had indicated to me that when I speak to Dr. Natarajan, I think to advise her, that he had checked with a medical society called Society of Medical Jurisprudence and had spoken to one of the officers in that society and had determined that Dr. Natarajan was indeed a member of that society.
And that he had so advised the citizens committee which apparently had *1238 previously sent out some kind of information to various media and other persons that Dr. Natarajan had not told the truth in her curriculum vitae by saying she was a member of this society when she wasn't.
And that now that he ... was personally... able to determine that she was indeed a member, he had contacted the citizens committee and had them send out letters of retraction to all the people that they originally sent out the letters of accusation and that he was pleased that he was able to correct that matter.
Defendant also asked Baden to assure Natarajan that defendant did not want to be the state medical examiner and that he would like to work with her to make the examiner's office "a better system than it was."[6] Baden told defendant that he had received a telephone call from a New Jersey Law Journal reporter earlier in the day and that he was concerned because the reporter's "spin" on the story was that Natarajan and the state medical examiner's office were out to get defendant.
The next day, Baden called Natarajan, informed her that he was making the call at defendant's request, and asked her if such an arrangement could be made even though he knew that the medical examiner's office could not bring or drop charges. When Baden asked Natarajan about the certification, she said that she had not signed any certification accusing defendant of improperly handling the bone. Natarajan denied that she had started an investigation or that she had done anything other than report the incident to Goode. Nevertheless, Natarajan said that she would relay the request to the Attorney General's office, which would have to approve any such meeting.
Baden reported this information back to defendant. Defendant responded "something to the effect that he was very glad to hear that, and that should make it all the easier for him to be able to work with Natarajan, once the matter is dropped, for the betterment of the New Jersey State Medical Examiner's Office." The meeting never took place.
In addition to the facts underlying the charges in the indictment, the trial focused upon whether (1) the right side of Puttorak's hyoid bone was fractured; (2) defendant altered the photographs he had taken on November 3, 1993, which did not show a fracture on the left side of the hyoid bone; and (3) two citizens groups, the Concerned Citizens for an Effective Medical Examiner (CCEME) and Romeo 68, were "fronts" for defendant. The first two issues created a "battle of the experts" with conflicting testimony.
The various experts testified to differing views as to the location of the fracture, whether tissue had been removed, whether the photographs and the actual specimen were the same, whether there was hemorrhaging, and although not generally challenged, whether the fracture was post-mortem and the result of strangulation. In sum, there were substantial factual issues for the jury to determine and sufficient disparate proofs to present a jury question on these issues.
The State attempted to demonstrate that CCEME and Romeo 68 were fronts for defendant by pointing out similarities in letters written by the groups and defendant. The State established that letters from defendant and the CCEME contained the same fax numbers and were similar in other respects, including the form and punctuation of the salutation and closing. Members of CCEME and Romeo 68 fervently disputed the State's position.
After seven days of deliberation, the jury found defendant guilty of tampering with a witness. The jury did not reach a verdict on the other charges.
*1239 On appeal, defendant raises the following issues:
1. THE STATE'S INABILITY TO SPECIFY WHAT THE DEFENDANT ALLEGEDLY WANTED WITHHELD MASKS A LACK OF JUROR UNANIMITY, AND THE STATE'S SUBSTITUTE THEORY THAT DEFENDANT WANTED TO PERSUADE LAW ENFORCEMENT AUTHORITIES TO DROP AN INVESTIGATION IMPERMISSIBLY REVISED THE INDICTMENT.
A. The Count Three verdict cannot stand because there is no assurance that the jury was unanimous as to which of the two charged crimes defendant supposedly committed.
B. The jury's verdict must be reversed because wanting an investigation dropped does not support the attempted witness tampering accusation.
2. THE INSTRUCTIONS ON COUNT THREE PERMITTED THE JURY TO FIND GUILT FOR CONDUCT WHICH IS NOT CRIMINAL.
A. Plenary appellate review of instructions on the essential elements is required notwithstanding the failure to timely object.
B. The lower court's charge on "knowingly" prejudicially relaxed the "practically certain" standard of N.J.S.A. 2C:2-2b(2).
C. The trial court had to charge "purposely" in accordance with N.J.S.A. 2C:5-1a(3) and N.J.S.A. 2C:5-1b.
D. The jury had to be charged that N.J.S.A. 2C:28-5a does not criminalize seeking truthful testimony; it only criminalizes solicitation of non-cooperation with law enforcement.
3. COUNT THREE MUST BE DISMISSED FOR INSUFFICIENT EVIDENCE.
A. The State's evidence is insufficient to satisfy the N.J.S.A. 2C:2-2b(2) requirement that the intended criminal result must be "practically certain."
B. The State's evidence is insufficient to satisfy the N.J.S.A. 2C:5-1b requirement of a "substantial step strongly corroborative of criminal purpose."
C. The State's evidence is insufficient for a rational fact-finder to find beyond a reasonable doubt that Dr. Speth was attempting to undermine law enforcement.
4. THE WHOLE INDICTMENT SHOULD BE DISMISSED ON ACCOUNT OF THE STATE'S INTENTIONAL SPOLIATION OF EXCULPATING EVIDENCE.
We have carefully reviewed the voluminous record in this matter and conclude that defendant's arguments as to Points 3 and 4 are without merit. R. 2:11-3(e)(2). We offer the following observations regarding issues raised by Points 1 and 2 which require further discussion.

A.
In arguing that his right to jury unanimity was violated, defendant argues that the indictment had to identify (1) whether defendant tried to induce Natarajan to withhold testimony or evidence and (2) which particular testimony or physical evidence. Instead, according to defendant, the indictment (1) listed "two different generic crimes in a single count," namely the withholding of testimony and the withholding of physical evidence and (2) failed to identify which particular testimony or physical evidence defendant allegedly tried to have Natarajan withhold. Defendant asserts that the jurors were required to be unanimous on which "genus" of witness tampering defendant committedthe *1240 withholding of testimony or the withholding of physical evidence.
Defendant's assertion is erroneous. Count Three, charging defendant with witness tampering, only charges defendant with one crimeknowingly attempting to induce Natarajan to "withhold testimony or physical evidence" at a time when he was "aware that an investigation and/or court proceedings were pending." Defendant was alleged to have committed one act of witness tampering based on a single act, the phone call to Baden. Defendant did not make a phone call to Baden and suggest that Natarajan withhold testimony and then make another call to suggest that Natarajan withhold physical evidence.
Defendant's reliance on State v. Krieger, 285 N.J.Super. 146, 153, 666 A.2d 609 (App.Div.1995), is misplaced. Krieger, which involved a challenge to an indictment, charged defendant with two distinct crimestampering with a witness to prevent his own apprehension and tampering to hinder another's apprehension. N.J.S.A. 2C:29-3a and b. The two crimes involved different elements.
The indictment here, the particulars of which are primarily the focus of defendant's attack, tracked the statute. It represented a pleading which could have been challenged on these grounds in a pre-trial application[7] or by way of a bill of particulars. Cf. State v. Mello, 297 N.J.Super. 452, 688 A.2d 622 (App.Div.1997) (rejecting a challenge to an indictment asserting that it failed to specify the unlawful purpose for possession of a firearm). The criminal episode which formed the basis of the indictment, defendant's phone call to Baden, supports the conclusion that defendant was not charged with two crimes but with two theories of one crime, a pleading methodology sanctioned by Krieger, supra, 285 N.J.Super. at 153, 666 A.2d 609.
Defendant next contends that Judge Cohen committed reversible error by refusing to grant a judgment of acquittal notwithstanding the verdict on the witness tampering charge. According to defendant, the indictment was impermissibly amended because the State's case consisted of nothing more than the fact that defendant wanted the State to drop its investigation into whether he had broken Puttorak's hyoid bone. Defendant argues that an individual's desire to have an investigation dropped is not witness tampering. In short, defendant maintains, "[w]anting the investigation stopped is not a crime." According to defendant, the prosecutor was required to specify "what testimony or what physical evidence [he] supposedly importuned Dr. Natarajan to withhold." Finally, defendant asserts that nowhere in the record is he "quoted as asking, directly or indirectly, that ... Natarajan withhold from investigators or the grand jury any testimony or physical evidence." Defendant's contention is without merit.
In denying defendant's motion for judgment of acquittal, Judge Cohen aptly observed:
I specifically do not agree with the claim that there was nothing that the jury could have found that the defendant was attempting to induce Dr. Natarajan to withhold. Quite clearly and quite obviously, the jury found, and based on the evidence presented to it could find reasonably, that the defendant was attempting to induce Dr. Natarajan to withhold her testimony that would implicate him in the tampering with physical evidence and at least the tampering with physical evidence charge dealing with the breaking of the hyoid bone and the fact that when she examined it almost immediately after Dr. Speth had examined it she found what she described as an obvious artifactual fracture of that bone made after death with no associated *1241 hemorrhage contrary to what Dr. Speth said he found which was a fracture made before death with associated hemorrhage on it. And, of course, we know, having sat through the entire trial, the significance of the differences in those kinds of findings.
The standard for deciding a R. 3:18-2 motion for judgment of acquittal notwithstanding the verdict is the same as that used to decide a motion for acquittal made at the end of the State's case or at the end of the entire case, State v. Kluber, 130 N.J.Super. 336, 341-42, 327 A.2d 232 (App.Div.1974) (citations omitted), certif. denied, 67 N.J. 72, 335 A.2d 25 (1975), to wit:
The trial judge must decide whether the evidence is sufficient to warrant a conviction. More specifically, the trial judge must determine whether the evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt. On such a motion the trial judge is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.
Clearly, it is not a crime for anyone under investigation to want the investigation stopped. Moreover, "[a] mere request for investigational or testimonial assistance ought not to be criminalized on the basis that it might be construed as an effort to suppress evidence." Krieger, supra, 285 N.J.Super. at 152, 666 A.2d 609; cf. State v. Rempel, 114 Wash. 2d 77, 785 P.2d 1134, 1136-37 (1990) (requesting a victim to "drop the charges" without more is not witness tampering).
However, the case against defendant was not merely based upon his "wanting an investigation stopped." The case centered upon what defendant did in order to achieve his objective, and the context of defendant's statement clearly could lead the jury to believe that he attempted to tamper with Natarajan. Defendant's telephone conversation with Baden contained more than the expression of his desire to have the investigation stopped. It contained more than a request for a meeting. Defendant's conversation with Baden suggested in no uncertain terms that if there was a meeting and the investigation was dropped, then Natarajan would be rewarded, as the CCEME's criticisms of her would stop. Id. at 1137; State v. Cavallo, 200 Conn. 664, 513 A.2d 646, 649-50 (1986) (finding that the defendant offered witness a "possible pecuniary reward" in exchange for false testimony).
Although defendant purportedly wanted the Attorney General to know about his request, he certainly did not want anyone from the Attorney General's office present during the meeting. In addition, in what could have been interpreted as defendant's willingness to "work with" Natarajan in getting the CCEME "off her back," he told Baden to tell Natarajan that he had already directed the CCEME to send out a letter of retraction with respect to one of the group's accusations against her. Finally, perhaps to demonstrate his "good faith," defendant requested that Baden assure Natarajan that he (defendant) did not want to be the state medical examiner, a position she was being considered for at the time. Here the jury appraised the factsas was its dutyand rejected defendant's suggestion that his statements to Baden were innocent.
The fact that defendant never asked Natarajan to withhold testimony or evidence is of no moment. It would be meaningless to limit witness tampering to instances where a defendant directly asks a witness to obstruct justice. This would exclude indirect attempts to tamper with witnesses by making comments either to third parties knowing that they will get back to the witness or even making comments directly to the witness, which, on *1242 the one hand, could be innocent, but in the context of the facts, could be threatening. In State v. Crescenzi, 224 N.J.Super. 142, 147, 539 A.2d 1250 (App.Div.), certif. denied, 111 N.J. 597, 546 A.2d 520 (1988), defendant did not speak directly to the witnesses; he spoke to two other people, knowing that his comments would get back to the witnesses. While our opinion did not detail defendant's words to the third parties, it seems evident that although seemingly innocent in content, they were menacing in context. As we observed:
The key, of course, is the jury's appraisal of the context, as well as the content of a statement. Uttered in one context, an apparently innocent statement such as, "I'd be careful crossing the street if I were you" can be merely helpful advice to a senior citizen. Uttered in another context it may well be correctly perceived by reasonable persons to be intended as a threat.

[Id. at 147-48, 539 A.2d 1250.]
Thus, it is of no consequence that defendant neither directly approached Natarajan and asked her to withhold testimony or evidence nor asked Baden to ask her to withhold testimony or evidence. Judge Cohen properly denied defendant's motion for judgment notwithstanding the verdict.

B.
Defendant also contends that Judge Cohen erroneously failed to charge the jury on the applicable meaning of "knowingly" and "purposely." Defendant argues that the judge should have defined "knowingly" as being "`aware that it is practically certain that his conduct will cause' the forbidden result," and "purposely" as taking a "`substantial step' which is `strongly corroborative of the actor's criminal purpose.'" According to defendant, "[e]ach error in the jury charge, without more, commands reversal." This contention is without merit.
Judge Cohen instructed the jury on the "knowingly" and "purposely" elements of witness tampering as follows:
The second element here is that the defendant knowingly attempted to induce or otherwise cause a witness to withhold testimony or anything else.
Knowingly is as I already defined it for you. I won't repeat it again. It refers to the defendant's state of mind. Is he aware, comprehends, knows, understands what he was doing?
Did he attempt to induce ... Dr. Natarajan through Dr. Baden to withhold testimony or evidence? Attempt is another legal term of art. When you attempt something you have to do something towards committing an act, have a purpose in your mind to complete the act but fail to complete it.
If I were to take a gun loaded gun, I point it at an individual with the purpose in mind of shooting and injuring that individual, pull the trigger, fire the bullet but I miss, we would say I attempted to shoot him. I did something. Pointed a loaded gun and pulled the trigger. I had the purpose in mind to complete the act but through something outside of myself, I didn't complete it. I missed.
If I hit it, it wouldn't be an attempt. It would be an actual shooting. So that is an attempt. Did you do something, have the purpose to complete the act but failed to complete, due to some outside source.
In this case did Dr. Speth do something to get Dr. Natarajan to withhold testimony or evidence? Did he call Dr. Baden ... and try to get him to intercede, and did he tell him about some kind of quid pro quo to induce Dr. Natarajan to do that? Did he have the purpose of causing her not to testify, or to withhold evidence? And did he fail to complete it? Because, in fact, it didn't work, according to the State's theory. Dr. Natarajan, first of all, Dr. Baden went to the authorities, and Dr. Natarajan did ultimately testify.
Was there this attempt? And was the defendant's purpose to influence the behavior *1243 of the witness? Having the purpose did he knowingly engage in the attempt to induce or otherwise cause Dr. Natarajan to withhold testimony or anything else?
If you are satisfied beyond a reasonable doubt of all of these elements, that Dr. Speth knowing that or believing that an official proceeding or investigation was pending or about to be instituted against him, did he knowingly attempt to induce or otherwise cause a witness, Dr. Natarajan, to withhold testimony or evidence against him? Did he do this with the purpose of causing her not to testify?
Judge Cohen initially instructed the jury on the meaning of "knowingly" during his charge on the first count of the indictment, tampering with physical evidence. The judge charged:
The second element of this offense is that the defendant knowingly altered the hyoid bone. Knowingly is what? It's a state of mind. It's what's going on inside someone's head. Knowingly means he understood, he was aware of, he comprehended. He knew in other words what he was doing when he broke the bone; if he did break the bone.
Knowledge is a state of mind. You can't see it or touch it like you can see or touch this pen for example. How do you prove what's going on inside someone's head? Remember what I said before about direct and circumstantial evidence? Generally a state of mind, be it knowledge or purpose or anything like that, is established by circumstantial evidence. By what someone says; by what someone does; by all the surrounding circumstances.
....
Now, if you find that this bone, this hyoid bone, was fractured or broken while being handled by Dr. Speth, did he do so knowingly? If it was broken accidentally that standard would not have been met here.
Defendant did not object to the jury instructions at trial; therefore, he waived his right to object on appeal, R. 1:7-2, except as plain error. R. 2:10-2. See State v. Afanador, 151 N.J. 41, 54, 697 A.2d 529 (1997).
With respect to jury charges, "[e]rroneous instructions on matters or issues that are material to the jury's deliberation are presumed to be reversible error in criminal prosecutions." State v. Jordan, 147 N.J. 409, 422, 688 A.2d 97 (1997) (citation omitted). Here, however, Judge Cohen's instructions were proper given the facts of this case and the language of N.J.S.A. 2C:28-5.
There is a dearth of case law in this State and throughout the United States on witness tampering. New Jersey's witness tampering statute is similar to Model Penal Code, § 241.6 (MPC),[8] and many other states have enacted similar statutes based upon the same section. Id. § 241.6 comment 1. However, the New Jersey Legislature inserted the term "knowingly" before the term "attempts" when it enacted our witness tampering statute. Compare MPC § 241.6(1) with N.J.S.A. 2C:28-5a.
In Crescenzi, supra, 224 N.J.Super. at 147, 539 A.2d 1250, we alluded to two distinct definitions of "knowingly" set forth in N.J.S.A. 2C:2-2b(2), which reads in pertinent part:
A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware *1244 of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result.
The statute sets forth two different meanings of the term. Town Tobacconist v. Kimmelman, 94 N.J. 85, 112 n. 12, 462 A.2d 573 (1983). In the second sentence, which defendant claims is the appropriate standard, the focus is on the intended result. For example, in a prosecution for murder and aggravated manslaughter, a knowing state of mind requires a defendant to have been aware or practically certain that his or her conduct would cause death or serious bodily injury resulting in death. State v. Clausell, 121 N.J. 298, 330-31, 580 A.2d 221 (1990). If the defendant acted without caring whether the result occurred or not, then he or she could not have been found to have acted knowingly with regard to the result. Id. at 331, 580 A.2d 221.
Similarly, in a prosecution for "distribut[ing] or dispens[ing], or possess[ing] with intent to distribute or dispense, or manufactur[ing] with intent to distribute or dispense, drug paraphernalia, knowing that it will be used ... [,]" N.J.S.A. 24:21-48[9] (emphasis added), the statute's requirement that a seller, "to be found guilty of violating the Act, must `know' that his items will be used for illegal purposes, is satisfied if he is `practically certain' that the item will be so used." Town Tobacconist, supra, 94 N.J. at 112, 462 A.2d 573. Additionally, in a prosecution for robbery under N.J.S.A. 2C:15-1, the "inflicts bodily injury or uses force upon another" element requires proof that the actor "knowingly" inflicted the injury or used force. Because "the injury/force element in robbery under the Code involves `conduct,' and cannot be regarded as simply an `attendant circumstance' requiring only an awareness by the defendant of its existence," the "practically certain" standard applies. State v. Sewell, 127 N.J. 133, 147-49, 603 A.2d 21 (1992).
In the case of witness tampering, where the attempt is illegal, the criminal act is completed regardless of whether or not the result is achieved. People v. Moyer, 670 P.2d 785, 791 (Colo.1983) (holding that it is "not necessary that the defendant succeed in his attempt or actually induce the witness to do anything" to be guilty of witness tampering); People v. Jelke, 1 N.Y.2d 321, 152 N.Y.S.2d 479, 135 N.E.2d 213, 219 (1956); Mont.Code Ann. § 45-7-206, annotator's note (crime does not require a showing of success in the altering of the witness's testimony or conduct); cf. State v. Robinson, 136 N.J. 476, 483, 643 A.2d 591 (1994) ("Criminalization of attempt focuses on the intent of the actor to cause a criminal result, rather than on the resulting harm.").
We conclude that the second definition of "knowingly," which requires the actor to be "practically certain that his conduct will cause such a result," is not an element of the offense and is incompatible with the crime of witness tampering, as it would put undue weight on whether or not the defendant's attempt was likely to succeed. Judge Cohen instructed the jury on the first meaning of "knowingly," that is, whether defendant was aware of the nature of his conduct. In other words, was defendant aware that he was attempting to tamper with a witness. Satisfying this requirement alone to support a conviction is sufficient to meet the societal need to discourage or preclude persons from interfering in the proper administration of justice. The evil to be addressed is approaching the witness rather than the likelihood of successfully convincing that witness not to testify or to alter such testimony.
In N.J.S.A. 2C:28-5, the term "knowingly" modifies the term "attempts." Because the crime is committed regardless of *1245 whether the result is achieved, it makes little sense to require the actor to be "practically certain that his conduct will cause such a result." We reject that argument.
Although our decision in Crescenzi makes reference to the second definition of "knowingly," we read Crescenzi as referring to that definition only to satisfy that defendant's constitutional challenge to the statute. We do not consider Crescenzi as requiring proof of the second definition in all cases, and we disagree with any reading of the case which so suggests. We are satisfied that Judge Cohen appropriately and adequately charged the jury on this charge.
Finally, we reject defendant's argument that a "substantial step" charge was necessary to supplement the "attempt" charge. Such a charge would require the jury to find that defendant did something which, "under the circumstances as a reasonable person would believe them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." N.J.S.A. 2C:5-1a(3). Generally, such acts must be "strongly corroborative of the actor's criminal purpose." State v. Fornino, 223 N.J.Super. 531, 540, 539 A.2d 301 (App.Div.), certif. denied, 111 N.J. 570, 546 A.2d 499 (1988). Defendant's insistence that because he merely requested a meeting, the "substantial step" charge was necessary to avoid "a conviction for any conduct, no matter how unlikely it was to result in a completed crime, and no matter how de minimis the actual conduct" disregards the critical fact that distinguishes this from the criminalization of simply requesting a meeting. If defendant had merely requested a meeting with Natarajan, perhaps the result would be different. However, defendant's request for a meeting was accompanied by the quid pro quo, in other words, the offer of a reward to Natarajan if she saw things his way. This offer removes all mystery from the true nature of defendant's request. A "substantial step" charge was not necessary here where the attempted tampering was complete upon the offer of the quid pro quo. If defendant had merely requested the meeting, then the substantial step charge may have been necessary because requesting a meeting in and of itself would not necessarily complete the crime "without further conduct on [defendant's] part." N.J.S.A. 2C:5-1a(2).
We affirm the judgment of conviction on the charge of N.J.S.A. 2C:28-5(a).
NOTES
[1] Defendant appealed the conviction, but because these charges are still pending, and their retrial awaits the outcome of this appeal, this appeal is interlocutory. Nevertheless, in the interests of justice, we grant leave to appeal, nunc pro tunc, and will decide the issues raised herein.
[2] Other issues were raised by additional motions including a "gag order" entered by the trial judge. That issue is the subject of other proceedings and is not addressed on this appeal.
[3] As it turned out, the state medical examiner pathologists had originally identified the hyoid bone fracture that they could see as having been on the right side when, in fact, it was on the left side. It was not until April 1994 that they realized their collective error when an independent expert hired by the State pointed it out to them.
[4] Prior to the April 1994 conversation, defendant had asked Baden to be an expert for him. However, Baden said that he did not think he could do so because he had worked with Goode, Natarajan and the Attorney General's office.
[5] The assistant attorney general testified at trial that he never showed defendant a certification signed by Natarajan, he never told defendant about any such document, and he was not even aware of any such document.
[6] Then Governor Florio had nominated Natarajan to succeed Goode as the state medical examiner upon his retirement.
[7] Defendant brought a pre-trial application to dismiss the indictment but urged other reasons for dismissal.
[8] MPC § 241.6 provides in pertinent part:

(1) Tampering. A person commits an offense if, believing that an official proceeding or investigation is pending or about to be instituted, he attempts to induce or otherwise cause a witness or informant to:
(a) testify or inform falsely; or
(b) withhold any testimony, information, document or thing.
[9] This provision, L. 1980, c. 133, § 3, was repealed by L. 1987, c. 106, § 25, and is now covered by N.J.S.A. 2C:36-3.