**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2232-17T2

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAALIL S. SPRUIEL, a/k/a
JAALIL S. SPRUIEEL,

      Defendant-Appellant.

_____

Submitted October 28, 2019 – Decided   November 6, 2019

Before Judges Sabatino and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 13-06-0550.

Joseph E. Krakora, Public Defender, attorney for appellant (Gilbert G. Miller, Designated Counsel, on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Kelsey Alina Ball, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This appeal arises out of a criminal jury trial in which defendant Jaalil Spruiel was charged with the murder of Tyrell Brighton, two weapons offenses, and witness tampering. The jury found defendant guilty of witness tampering but not guilty of murder and the weapons charge.

After denying defendant's motion for a new trial, the trial court sentenced defendant to a discretionary extended term of six years imprisonment with jail credits.[1]

On appeal, defendant argues the State's proofs were insufficient to establish he violated the witness tampering statute, N.J.S.A. 2C:28-5(a). He further contends, for the first time on appeal, that the court's jury instruction on witness tampering was flawed.

For the reasons that follow, we affirm.

## I.

We summarize the relevant proofs from the six-day trial. The case involved a drive-by shooting of the victim that was purportedly witnessed by

---

[1] Defendant does not challenge his sentence on appeal.

two persons, Antoinette Brown, a/k/a "Sweets" and a male individual who we shall refer to by the fictitious initials, "C.C."[2]

A. Brighton's Death and Initial Testimony

On July 16, 2010, Tyrell Brighton was shot and killed on Plainfield Avenue in Plainfield.

On September 14, 2010, Lieutenant Jorge Jimenez, then a member of the Union County Prosecutor's Office Homicide Task Force, learned that Brown had information about Brighton's shooting. On September 14 and 15, Jimenez successively recorded a videotaped interview and then statement with Brown.[3]

Brown told Jimenez she was a member of the G-Shine gang. She considered Brighton a close friend. According to Brown, the day of the shooting, she was with Brighton and several other people on the corner of Plainfield Avenue. She saw a "tan, four door" older vehicle come down the street carrying several people. A person she referred to as "Bow Wow," known to her as a member of a rival gang, was sitting on the passenger rear side and

---

[2] We use fictitious initials for this other eyewitness because he requested to be placed in protective custody in prison as a result of the events in this case.

[3] Brown's videotaped statements were admitted following a Gross hearing. See State v. Gross, 121 N.J. 1 (1990) (prescribing a hearing and multiple factors to determine the admissibility of a testifying witness' prior inconsistent statements).

shot roughly twelve to thirteen shots into the crowd. She identified "Bow Wow" as defendant from a photo array provided by Detective Jimenez.

C.C. was arrested on October 11, 2011, apparently on unrelated charges. That same day, he conducted a videotaped interview with Jimenez.[4]

C.C. said he was a member of the G-Shine gang. He claimed he was standing next door to where Brighton was shot when it occurred. On the day of the shooting, he saw defendant, who he knew as "Bow Wow," fire roughly thirteen shots out of the back window of a "gold colored Nissan Altima."[5]

C.C. identified the four people in the car, all of whom were members of a rival gang, using nicknames and physical descriptions, and drew an image placing them in their approximate positions in the vehicle.[6] C.C. said he could identify the specific car because it belong to a woman named Sophia, who would rent it out to members of his gang. Following the interview, C.C. identified defendant in a photo array, remarking that he would "never forget that face."

---

[4] C.C.'s taped interview, as well as his subsequent 2012 interview with Jimenez, were admitted following a Gross hearing.

[5] C.C. initially said defendant was on the left side of the car but, upon Jimenez' prompting, said he was on the right side of the car.

[6] Brown and C.C. did give conflicting testimony about the other people in the car – Brown claimed to identify a person she referred to as "Frank White" and C.C. did not identify him in the car.

A-2232-17T2

B. <u>Defendant's Interactions with C.C.</u>

Sometime in mid-2012, C.C. received an eight-year sentence with a four-year parole disqualifier.

On June 4, 2012, C.C. wrote a letter to defendant.[7]  In his letter, C.C. asked defendant to send him an affidavit reflecting that C.C. had lied in his earlier statements and did not see defendant shoot Brighton.  He asked defendant for Brown's contact information, and wrote "I'll make her sign that shit" in reference to a similar affidavit.  C.C. also wrote "P.S. Hold off on that work. Do it for me. I'm coming through for you."

On June 15, 2012, C.C. requested to be moved into protective custody ("PC").  C.C. told corrections officers he was concerned about letters defendant had written to fellow gang member Matthew Williams, a/k/a "Twin," who was housed in the same prison as C.C.

On June 19, 2012, defendant wrote a letter to "Twin," which read:

> Twin, what's good with you bro? Me you know same ole' shit different day but whats going on with you. I remember when you told me you had to go to court but I don't know if you still over there with ole' boy. He just busted at me so I guess you hollered at him good looking. I just need you to tell him the next steps. I'm sending the affidavit but he should be getting one

---

[7] This letter was not admitted into evidence, but the jury was allowed to hear testimony about its contents without objection.

5

in the next week but if he don't get it by next Friday then tell him to just sign this one but he first got to sign it then get it notarized. Usually the law library will notarize it but after he does that I need him to get copies one for you one to send to me and send the original to my lawyer. I'll give you the address at the end of this letter but once he get that done than you can decide what you want to do with him but stop cuffing the hoes (LOL) but I got some more flicks for you but get back at me asap. He should write it to this address [defendant provides the address of his public defender].

P.S. Soon as it done get at me asap.

In another letter dated that same day, defendant wrote to C.C.:

What's good with you? Me doing the best in the worst situation especially for some shit I had nothing to do with but I'm gonna keep this shit short and to the point. You already know I had nothing to do with this shit as you told me in the letter you wrote me. I see people do shit when there backs are against the wall even if it ain't the truth but what counts is weather they make it right in the end. I'm sending you a affidavit since you didn't know how to get it done plus you told me what happened. All you got to do is some stand up shit and it's back to the money but what you got to do is sign it first then get it notarized at the law library usually and send a copy back to me and my lawyer. I'll give you the address at the end and one to Twin. That easy but it got to be down in like two weeks cause I go to court and I'm tired of going back for some shit I had nothing to do with but bust back asap. I'm sending you one and Twin and you should be getting one in the mail. Whatever one you get just get it done first. You got to send it to this address like this [defendant provides the address of his public defender]

A-2232-17T2

The letter to C.C. included an attached affidavit, which read:

> To Whom It May Concern:
>
> I, [C.C.], swear under penalty of perjury that the following is true and accurate:
>
> An incident (Indictment No. 12-02-001361) involving a shooting took place on June 16th, 2010, in which I was questioned about. I provided the police with false information implicating Jaalil Spruiel in that shooting. The reason I did this is because at the time I was facing several charges and I was hoping to get leniency on those charges. I knew Jaalil Spruiel as from that neighbor hood and we had problems in the past that's why I used his name. I concocted this story with the assistance of Antennett Brown (a.k.a. "Sweets") we were romantically involved and she too was also facing several charges and looking to get a "sweet deal" at the expense of lying on Mr. Spruiel. Antennett Brown wasn't even at the scene personally that's why she couldn't get the story straight. I personally saw that the vehicle was traveling in the opposite direction from Seventh Street even though I stated it was heading toward Seventh Street and I also know for a fact Jaalil Spruiel wasn't in the rear passenger seat of that car as I got a good look at the occupants in the vehicle. I am very familiar with Jaalil Spruiel because I've had up-close and personal run-ins with him in the past and I did not observe him in that vehicle at all. I am willing to testify for the defense to what I've stated above including the fact that Antennett Brown wasn't on the scene and I was the one who told her the story.
>
> I am making this statement of my own free will. I have not been forced threatened or coerced in any way to make this statement.

7

Truly yours,

[C.C.]

Both of defendant's letters were seized by investigators before they reached their intended recipients and were never delivered. The letters were admitted into evidence at trial without objection and stipulated as written by defendant.

On July 17, 2012, C.C. conducted a taped interview with Lieutenant Jimenez at the Union County Prosecutor's Office. During that session, C.C. completely recanted his earlier narrative. He told Jimenez he had made his earlier statement inculpating defendant in the hopes of getting a more lenient sentence. He claimed that on the date of the shooting he was high on a variety of drugs. He stated he did not witness the shooting, but only heard gunshots from down the street.

C.C. told Jimenez he knew defendant wrote two letters to Twin while C.C. and Twin were in the same prison. C.C. said he had learned of the letters through a friend from his "hood" who'd obtained at least one of the letters, showed it to C.C., then destroyed it. As described by C.C., defendant wrote to Twin saying

that he had learned from his "paperwork"[8] that C.C. was a "snitch" against him in the present case and he was also aware Brown had identified defendant as the shooter. The letters told Twin to "see what's up [with]" C.C.

C.C. further told Jimenez that someone from defendant's "hood" had approached C.C. while he was at court, telling him that defendant knew C.C. had identified him as the shooter.

C.C. and Lieutenant Jimenez discussed his request to be moved into PC. C.C. said that, while nothing had happened yet, after learning of the letters he wanted to go into PC "before the shit escalated." In response to Jimenez's further questioning, he said the reason he requested the move was because of "fear" that people would be "moving on him" for speaking against defendant. He told the detective it would be best if he were moved to a different prison. C.C. noted that his "credibility [was] shot already" because people now knew and referred to him as a snitch.

C. Testimony at Trial

At trial, Brown acknowledged giving her initial statement to Jimenez. However, Brown claimed at trial she could not remember who was at the scene

---

[8] The term "paperwork" in this context apparently refers to material defendant received in discovery.

when Brighton was shot, did not see who shot him, what the car looked like, and could not identify anyone in the car. She further testified that she could not remember why she had identified defendant in a photo array.

C.C. also testified. On the State's direct examination, he claimed he could not remember what he said in his initial statement to Jimenez or why he identified defendant in a photo array. On cross examination, C.C. contended he had not been present at the scene of the shooting but only heard the gunshots. He testified that he was high on "[h]eroin, Xanax," "weed" and other drugs at the time and only heard the details second-hand. C.C. maintained that any statements implicating defendant in the shooting were lies.

C.C. told the jury he had sought PC while in prison because of a conflict with a woman's "baby father" who was also in the same prison. When asked why he had previously told corrections officers and Jimenez that he wanted to go into PC because of issues with defendant and defendant's gang, he said he had lied.

When C.C. was asked about his letter to defendant on cross examination, he asserted it simply was an attempt to apologize and avoid further trouble. C.C. claimed he had asked defendant for an affidavit because he did not know how to prepare one himself.

According to C.C., he did not know what the letter's statement "Hold off on that work. Do it for me. I'm coming through for you" meant. He also claimed he did not know what he was referring to when he advised defendant he was sending Sweets information and would "make her sign that shit." C.C. claimed he did not know why he wrote those statements.

C.C. did acknowledge that he and Brown were in the same gang and knew each other. He also admitted having a sexual relationship with her in the past.

The State presented testimony from Plainfield Police Sergeant Lawrence Brown, Jr. He was qualified, without objection, as an expert in the area of Plainfield criminal street gangs and related street gang activity.

Sergeant Brown explained to the jury that the phrase "put in work" was a term "generally used when a gang member has to commit a crime or do something for the benefit of the gang." The sergeant further explained that when one gang member was labeled a "snitch," including by a member of another gang, "they're going to get disciplined to the extreme so they may get shot, they may get killed, or they may get beaten half to death" even by members of their own gang.

Defendant did not testify and presented no witnesses.

As we have already noted, the jury found defendant guilty of witness tampering, but acquitted him of the other counts of the indictment.

## II.

In his brief on appeal, defendant argues:

> POINT I
>
> DEFENDANT'S CONVICTION WAS NOT SUPPORTED BY THE EVIDENCE, AND THE COURT SHOULD HAVE ENTERED A JUDGMENT OF ACQUITTAL OR ORDERED A NEW TRIAL.
>
> POINT II
>
> THE COURT ERRED IN ISSUING FINAL JURY INSTRUCTIONS WHICH FAILED TO INSTRUCT ON THE CAUSATION ELEMENT OF THE WITNESS TAMPERING STATUTE AND IN FAILING TO MOLD THE INSTRUCTIONS TO THE EVIDENCE ADDUCED AT TRIAL. (Not raised below).

Neither of these arguments has merit.

## A.

We first discuss whether the State's proofs were sufficient to establish the offense of witness tampering.

A court shall enter an order for a judgment of acquittal only "if the evidence is insufficient to warrant a conviction." R. 3:18-1. The long-established standard to determine a motion for a judgment of acquittal at the

A-2232-17T2

conclusion of the State's case was articulated in State v. Reyes, 50 N.J. 454 (1967):

> [T]he question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [Reyes, 50 N.J. at 458-59 (citing State v. Fiorello, 36 N.J. 80, 90-91 (1961)).]

Under Rule 3:18-1, the court "'is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'" State v. Papasavvas, 170 N.J. 462, 521 (2002) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)). "If the evidence satisfies that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004). We apply this same standard on appeal. State v. Kittrell, 145 N.J. 112, 130 (1996).

In a related vein, a trial court may set aside a jury verdict and grant a motion for a new trial only where "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." R. 3:20-1.

13

We adhere to the same standard. R. 2:10-1 ("The trial court's ruling on such a motion shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law."). See also State v. Carter, 91 N.J. 86, 96 (1982) (a reviewing court must "determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present.").

Applying these well-established principles, we discern no basis to set aside the jury verdict.

The witness tampering statute, N.J.S.A. 2C:28-5, "furthers the important governmental interest of preventing intimidation of, and interference with, potential witnesses or informers in criminal matters." State v. Crescenzi, 224 N.J. Super. 142, 148 (App. Div. 1988).

Witness intimidation, particularly in cases of gang violence, is an endemic problem. Our Supreme Court has noted, in the context of adopting a forfeiture-by-wrongdoing hearsay exception designed to deter such intimidation:

> Witness intimidation is no stranger to New Jersey. Threats to witnesses, the killing of witnesses, and the climate of fear that prevails in some crime-infested neighborhoods have undermined law enforcement's ability to prosecute even murder cases.
>
> . . . .

In some crime-ridden communities, it is understood that breaking the street code of silence may lead to a brutal beating, maiming, or death.

. . . .

From our review of countless petitions for certification, we can take judicial notice of the all too typical scenario—witnesses to a violent or drug crime give signed or tape-recorded statements to the police at the commencement of an investigation, only to recant their statements or have memory failure at the time of trial.

[State v. Byrd, 198 N.J. 319, 340-41 (2009).]

Given the importance of these public safety and evidential concerns, the Legislature intended the witness tampering statute to be "applied as broadly as possible." Sponsor's Statement to S. 367 5 (L. 2008, c. 81) (discussing the intent of the 2008 amendments to the tampering statute).

Under the terms of the statute, a defendant is guilty of witness tampering:

if, believing that an official proceeding or investigation is pending or about to be instituted or has been instituted, he knowingly engages in conduct which a reasonable person would believe would cause a witness or informant to:

(1) Testify or inform falsely;

(2) Withhold any testimony, information, document or thing . . . .

[N.J.S.A. 2C:28-5(a)].

In essence, there are two requirements for a conviction under N.J.S.A. 2C:28-5(a):    (1) a defendant must believe an "official proceeding or investigation" is or will be instituted; and (2) he or she must "knowingly engage[] in conduct" that a reasonable person would believe would cause a witness to testify falsely, withhold testimony, or behave in an otherwise enumerated way.

### 1.

As to the first key element, defendant does not argue he did not believe an official proceeding or investigation was taking place at the time of the pertinent events.  Indeed, this belief can be inferred from circumstantial evidence, such as defendant's awareness of various types of government action.  See State v D.A., 191 N.J. 158 (2007).

In her ruling denying a new trial, Judge Lisa Miralles Walsh[9] found this element was satisfied.  She noted it is unrefuted that defendant learned C.C. had made statements against him from materials he received in discovery, and that defendant was incarcerated when he sent the letters to Twin and C.C.  These facts provide ample evidence to satisfy the first element of N.J.S.A. 2C:28-5(a).

---

[9]  The trial was presided over by Judge Scott Moynihan, who was no longer sitting in the trial court when defendant's post-trial motion was heard.

2.

As to the second element of tampering, a defendant must "knowingly engage in conduct" which a reasonable person would find "would cause" a witness or information to change his or her story or otherwise not testify truthfully. N.J.S.A. 2C:28-5(a).  This element also was reasonably supported by the State's proofs.

We recognize a defendant's mere desire for an investigation to end, or requesting investigatory or testimonial assistance, does not satisfy this requirement.  State v. Speth, 323 N.J. Super. 67, 81–82 (App. Div. 1999); State v Krieger, 285 N.J. Super. 146, 152 (App. Div. 1995).  However, a defendant need not use force or the threat of force to achieve his or her ends to be guilty of tampering.  See N.J.S.A. 2C:28-5(a) (force or threat of force elevates witness tampering from a third-degree crime to the second-degree).  A defendant's statements and actions must be considered in context.  Crescenzi, 224 N.J. Super. at 147-48.  The State is not required to produce evidence that a defendant spoke or threatened a witness directly.  Speth, 323 N.J. Super. at 83.

Defendant argues that no reasonable juror, presented with the evidence in this case, could conclude he had "committed acts which knowingly would cause [C.C.] to change his story."  He argues there must have been a "completed

offense" of witness tampering. By his premise, this in turn requires evidence that defendant knew that asking Twin to approach C.C. "would be a 'but for' act of causation which would induce [C.C.] to change his account or withhold information."

Since defendant's letters never reached C.C. or Twin, he assumes "a jury could not find that [C.C.] actually changed his account because of defendant's acts of drafting the letters and proposed affidavit" and mailing it to C.C. Defendant further emphasizes that C.C. consistently adhered to his second version of events from 2012 through trial. He argues this consistency over several years could not be explained by the two letters from defendant, which never made it to their intended recipients.

At the close of trial, Judge Moynihan denied defendant's motion for a judgment of acquittal on all charges. As to the witness tampering charge, the judge cited as significant C.C.'s testimony that "after letters were received from [defendant] in the correctional facility in which [C.C.] was located[,] he wanted to get moved or get to PC[,] at least implying that a threat was made." This testimony, when combined with defendant's letter to C.C., could refute defendant's story, and was deemed "sufficient evidence to meet the Reyes requirements for Count [four]."

 A-2232-17T2

Judge Miralles Walsh likewise found there was sufficient evidence to support a witness tampering charge when she denied defendant's post-trial motion for a new trial. She found there was evidence that "at the very least [defendant,] through the use of an intermediary Twin[,] was reaching out to [C.C.] and . . . wanted [C.C.] to sign the affidavit recanting his prior statement." The judge noted C.C.'s letter, specifically the sections that said C.C. was "coming through for" defendant and asking him to "hold off on that work." She concluded this evidence, along with the jury's consideration of other material and the credibility of the witnesses, was sufficient to deny a motion for new trial.

We conclude both Judges Moynihan and Miralles Walsh correctly ruled there was sufficient evidence to allow a reasonable jury to convict defendant of witness tampering.

The evidence here arguably supported at least two contrary narratives. First, as defendant argues, the timeline of events could suggest C.C. independently wrote to defendant of his own initiative and without coercion. Since defendant's letters were never received by C.C., defendant argues there is no proof any of his actions caused this change. It is at least plausible that C.C. gave false evidence against defendant when he was facing his own charges and,

A-2232-17T2

when this did not result in more favorable treatment, sought to recant. On this theory, defendant's efforts to provide C.C. with an affidavit could be viewed as a "mere request . . . for testimonial assistance." Krieger, 285 N.J. Super. at 152.

On the other hand, there is ample evidence C.C. was aware that defendant knew he and Brown were going to testify against him, that defendant had spread this information to people in the same prison as C.C., and that C.C. was afraid, with reason, that this information would put him in danger. The jury had a reasonable basis to regard this conduct as witness tampering.

As the triers of fact, the jurors saw the detailed, videotaped testimony of C.C. and Brown. They had the opportunity to compare this evidence with the vague, unedifying trial testimony rebutting these earlier statements. The stark contrast between the statements itself reasonably suggests that pressure had been applied by defendant, directly or indirectly, to the witnesses to attempt to get them to recant their testimony.

Moreover, the jury heard C.C.'s recorded statements that he knew defendant sent letters to Twin identifying C.C. as a "snitch" shortly after C.C. entered prison. These purported letters could reasonably be viewed as efforts to manipulate C.C.'s testimony, especially in light of C.C.'s statements that these letters were the reason he sought out PC status. Defendant's brief acknowledges

that, according to C.C., "being unmasked as an informant" caused him to contact defendant and change his account, without acknowledging it was defendant who did the unmasking.

The portions of C.C.'s letter to defendant that were read to the jury reasonably supported the State's theory he feared some reprisal from defendant or people associated with defendant. C.C.'s reference in his letter to "hold off on that work" surely could be interpreted as a request to hold off on threatening or harmful conduct. This is consistent with Sergeant Brown's expert testimony about the meaning of those words and the repercussions of "snitching" in criminal gangs.

A juror could also take the statement that C.C. could "make" Brown sign an affidavit recanting her testimony as an effort to put pressure on her for defendant's sake, and for C.C.'s benefit, rather than an effort to present a truthful record. The jury could, and presumably did, assess the credibility of these statements in light of his testimony, in which C.C. repeatedly claimed he did not know what the statements in his letter meant.

Defendant's letter to Twin, in which he thanks Twin for contacting C.C., and tells him that, once C.C. signs the affidavit, that Twin can "decide what you want to do with him," is especially relevant. The letter to Twin served as

21

evidence of both a threat to C.C.'s safety as well as and proof there was ongoing contact between defendant and C.C. through Twin that was intended to manipulate C.C.'s testimony.

In sum, a reasonable person, viewing all the evidence in context, could conclude defendant sought to coerce C.C. into changing his testimony, and that C.C. in fact changed his testimony in response to defendant's actions. The jurors were not obligated to adopt defendant's contrary interpretation of the events.

3.

Defendant's emphasis on the causal effect of the letters sent to Twin and C.C. is misplaced. Even though the two letters defendant sent to C.C. and Twin never made it to their intended recipients, as a matter of law these letters still can comprise unlawful acts of witness tampering.

The tampering statute focuses on whether a defendant's actions could reasonably be construed as attempts to alter testimony. There is no requirement in the statute that a defendant succeed, or even actually contact a witness.

In State v. Mendez, 175 N.J. 201, 211-12 (2002), the Supreme Court contrasted the witness tampering statute with N.J.S.A. 2C:28-6, which criminalizes tampering with physical evidence. The evidence-tampering statute requires, as a necessary element, "the permanent alteration, loss, or destruction

22

of the evidence itself," while the witness tampering statute has no such completion requirement. Ibid. Distinctly, "[t]he mere attempt at witness tampering . . . has an immediate and significant capacity to undermine the integrity of the criminal justice system." Ibid.; see also Speth, 323 N.J. Super. at 87 ("In the case of witness tampering . . . the criminal act is completed regardless of whether or not the result is achieved.") (emphasis added).

This interpretation of the witness tampering statute is in accord with the 2008 amendments, which changed the requirement that a defendant knowingly "attempts to induce or otherwise cause" to the revised language of "engages in conduct which a reasonable person would believe would cause" a witness to alter testimony. See N.J.S.A. 2C:28-5; cf. Crescenzi, 224 N.J. Super. at 146 (quoting the original language).

By removing any language requiring an "attempt," the revised witness tampering statute removes an emphasis on the actual relationship between a defendant's actions and the witness in question. Instead, the present statute only requires a reasonable juror to assess whether a defendant's actions "would," in

A-2232-17T2

the abstract, cause a witness to alter testimony, even if such conduct does not achieve that result.[10]

Defendant's contention that any actions must be "an antecedent <u>but for</u> which the result in question would not have occurred," N.J.S.A. 2C:2-3 (emphasis added), incorrectly "put[s] undue weight on whether or not the defendant's attempt was likely to succeed" and would therefore be contrary to the language and intent of amended statute. <u>Speth</u>, 323 N.J. Super. at 87.

Defendant's letters could reasonably be read as part of an overall effort to convince C.C. to lie, using the threat of reprisal by Twin if he does not. The letters could therefore be considered acts of witness tampering, even though they never reached their intended recipients.

For these many reasons, we therefore affirm the trial court's denials of relief, and reject defendant's claim that the weight of the evidence could not reasonably establish his guilt.

B.

---

[10] As one authority correctly notes, "[t]he statute no longer looks to the law of attempt. The actions of [a] defendant are now measured by a reasonable person standard." 33 N.J. Practice, Criminal Law § 22:5 (Robert Ramsey) (rev. 5th ed. 2019).

24

Defendant separately argues, for the first time on appeal, that "the trial court plainly erred by omitting completely instruction on the causation element of the crime of witness tampering." We reject this argument because the jury instructions were not deficient.

Notably, defendant did not object to the jury instructions at trial, either in the charge conference or after the charge was issued. Consequently, a plain error standard of review applies. State v. Green, 86 N.J. 281, 287 (1981). In assessing whether such plain error is present, we are mindful a trial court has an "independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party." State v. Reddish, 181 N.J. 553, 613 (2004) (citing State v. Thompson, 59 N.J. 396, 411 (1971)).

A reviewing court must consider claimed defects of a jury charge within the overall context of the charge as a whole. State v. Simon, 161 N.J. 416, 477 (1999). The alleged error must be "viewed in the totality of the entire charge, not in isolation." State v. Chapland, 187 N.J. 275, 289 (2006). If, upon reviewing the charge as a whole, the reviewing court finds that prejudicial error did not occur, then the jury's verdict must stand. State v. Coruzzi, 189 N.J. Super. 273, 312 (App. Div. 1983).

A-2232-17T2

Defendant argues the trial court was required to instruct the jury on the statutory general definition of causation under N.J.S.A. 2C:2-3. He maintains this definition was "critical" in order for the jury to understand whether defendant's actions were the kind that "would cause [C.C.] to testify falsely or withhold information." Ibid. He posits that without such an instruction, jurors could impermissibly draw an inference between the "simple correlation" between defendant telling Twin he knew C.C. had given information to police and C.C. changing his testimony, or from the correlation "between defendant's attempts to provide [C.C.] with a recantation affidavit . . . without considering that [C.C.] recanted without receiving the affidavits." We disagree.

The jury instructions plainly conformed to the model jury instructions. This conformity weighs heavily against defendant's claim of plain error. "When a jury instruction follows the model jury charge, although not determinative, 'it is a persuasive argument in favor of the charge as delivered.'" State v. Whitaker, 402 N.J. Super. 495, 513–14 (App. Div. 2008), aff'd, 200 N.J. 444 (2009) (citation omitted).

The charges were appropriately molded to the particular facts of this case, only delineating the relevant sections of N.J.S.A. 2C:28-5(a)(1-2) (describing

26

actions which would cause a witness to testify or inform falsely or withhold testimony), and only discussing the elements of a third-degree charge.

The trial judge duly provided the definition of "knowingly" from N.J.S.A. 2C:2-2(b)(2), as required by the model instructions. [9T118-120]; Model Jury Charges (Criminal), "Tampering with Witnesses and Informants (N.J.S.A. 2C-28-5a) (Cases arising after September 10, 2008)" (approved Mar. 16, 2009). The essential conformity between the model charge and the actual charge substantiates there was no plain error here.

Defendant further argues that the model jury charge and the charge given in this case are critically deficient because they do not require an explanation of causation. We discern no such flaw.

As we have already discussed, supra, N.J.S.A. 2C-28-5(a) does not require the State to prove a defendant's actions actually caused a witness to alter or withhold testimony. The focus instead is on how a reasonable person could interpret a defendant's actions, not whether the defendant successfully pressured a defendant to change his or her testimony. See Mendez, 175 N.J. at 211 ("The mere attempt at witness tampering . . . has an immediate and significant capacity to undermine the integrity of the criminal justice system.").

Defendant's proven efforts to threaten or intimidate witnesses in this matter amply satisfies the statute as a matter of law, even without those actions causing C.C. or Brown to alter their testimony. The trial court correctly omitted any causation requirement from the charge, as it was unnecessary. There was no error, let alone plain error.

In sum, the jury charge was adequate and appropriate. We therefore reject defendant's arguments for reversal.

C.

To the extent we have not discussed them, any other points or sub-points made by defendant lack sufficient merit to discuss in this opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION