# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1137-17T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARCUS PENDLETON, a/k/a
ZACHARY PENEDLETON,

    Defendant-Appellant.

_____

Submitted May 26, 2020 – Decided September 3, 2020

Before Judges Fasciale and Rothstadt.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-04-0877.

Joseph E. Krakora, Public Defender, attorney for appellant (Howard Woodley Bailey, Designated Counsel, on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Maura Murphy Sullivan, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Marcus Pendleton appeals from an August 7, 2017 judgment of conviction and his twenty-four year sentence that was entered after a jury found defendant guilty of charges arising from his beating of a woman with whom he lived and had a dating relationship, and from his attempts to hide evidence of his crime and persuade the victim not to bring charges against him or testify in court. On appeal, he argues the following points:

POINT I

THE COURT ERRED IN DENYING DEFENDANT'S REQUEST TO CHARGE THE JURY WITH INTOXICATION AS A DEFENSE.

POINT II

THE COURT ERRED IN PROHIBITING [DEFENDANT'S] EXPERT WITNESS TO TESTIFY ABOUT DEFENDANT'S INTOXICATION AND THE EFFECT IT HAD ON HIS ABILITY TO ACT PURPOSELY AND KNOWINGLY.

POINT III

THE COURT ERRED IN PREVENTING DEFENDANT FROM CALLING HIS MOTHER AS A WITNESS TO ESTABLISH THE EXISTENCE OF TEXT MESSAGES THAT SHOWED [THE VICTIM] WAS AWARE OF [DEFENDANT'S] ALCOHOL PROBLEM.

2

POINT IV

THE VERDICT WAS AGAINST THE WEIGHT OF
THE EVIDENCE.

POINT V

THE SENTENCE IMPOSED WAS EXCESSIVE.

In a supplemental pro se brief, defendant also argued the following:

POINT I

COUNT 1 OF THE INDICTMENT IS FATALLY
FLAWED IN THAT IT FAILS TO CHARGE AN
OFFENSE AGAINST THE DEFENDANT. [U.S.
CONSTITUTION AMENDMENTS V AND XIV; N.J.
CONSTITUTION, ARTICLE 1, PARAGRAPHS 8,9,
10, AND 11].

. . . .

POINT II

A GENERAL VERDICT OF GUILT WAS
RETURNED FOR COUNT 1 AND COUNT 2 OF THE
INDICTMENT WITHOUT AN UNDERSTANDING
OF WHICH PARTICULAR OFFENSE WAS THE
SUBJECT OF THE JURY'S DETERMINATION.
[U.S. CONSTITUTION, AMENDMENTS V AND
XIV; N.J. CONSTITUTION, ARTICLE 1,
PARAGRAPHS 8, 9, 10, AND 11].

. . . .

A-1137-17T3

POINT III

THE TRIAL COURT'S CHARGE TO THE JURY CONVEYED A MISINFORMATION OF THE LAW [U.S. CONSTITUTION, AMENDMENTS V AND XIV; N.J. CONSTITUTION, ARTICLE 1, PARAGRAPHS 8, 9, 10, AND 11].

A. COUNT 2 – N.J.S.[A.] 2C:28-5(a)(5) – TAMPERING WITH WITNESSES AND INFORMANTS; RETALIATION AGAINST THEM.

B. COUNT 4 – N.J.S.[A.] 2C:28-5(a) – TAMPERING WITH WITNESSES AND INFORMANTS; RETALIATION AGAINST THEM.

N.J.S.[A.] 2C:2-4 – EVIDENCE OF MENTAL DISEASE OR DEFECT.

POINT IV

THE TRIAL COURT ERRED IN ITS COMPOSITION OF THE VERDICT SHEETS. [U.S. CONSTITUTION, AMENDMENTS V AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPHS 8, 9, 10, AND 11].

A. COUNT 1 – N.J.S.[A.] 2C:12-l(b)(l) – AGGRAVATED ASSAULT.

B. COUNT 2 – N.J.S.[A.] 2C:28-5(a)(5) – TAMPERING WITH WITNESSES AND INFORMANTS; RETALIATION AGAINST THEM.

POINT V

THE TRIAL COURT ERRED IN FAILING TO SUA SPONTE CHARGE THE JURY WITH APPLICABLE LAW/DEFENSES. [U.S. CONSTITUTION,

4

AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

A.    N.J.S.[A.] 2C:2-3(b) – CAUSATION.

B.    N.J.S[A.]. 2C:2-8(e)(2) – INTOXICATION.

C.    N.J.S.[A.] 2C:3-4(a) – USE OF FORCE IN SELF-PROTECTION; N.J.S.[A.] 2C:3-6(a) – USE OF FORCE IN DEFENSE OF PREM[ISES] OR PERSONAL PROPERTY.

POINT VI

THE FINDING OF GUILT FOR EACH COUNT OF THE INDICTMENT WAS BASED ON INSUFFICIENT EVIDENCE [U.S. CONSTITUTION, AMENDMENTS V AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPHS 8, 9, 10, AND 11].

. . . .

POINT VII

THE KNOWING USE OF PERJURED TESTIMONY BY THE STATE DENIED . . . DEFENDANT OF HIS RIGHT TO A FAIR TRIAL [U.S. CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

POINT VIII

THE SENTENCING JUDGE ERRED IN FAILING TO CONSIDER APPROPRIATE AGGRAVATING AND MITIGATING FACTORS BASED ON THE RECORD.  [U.S. CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

A.    THE SENTENCING JUDGE COMMITTED AN ABUSE OF DISCRETION IN ERRONEOUSLY ATTRIBUTING AGGRAVATING FACTORS IN DETERMINING DEFENDANT'S SENTENCE.

B.    THE SENTENCING JUDGE ERRED IN FAILING TO CONSIDER MITIGATING FACTORS THAT WERE AMPLY BASED ON THE RECORD.

POINT IX

THE DEFENDANT WAS IMPROPERLY SENTENCED TO AN EXTENDED TERM OF IMPRISONMENT.    [U.S.    CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

POINT X

THE TRIAL JUDGE ERRED IN ALLOWING PREJUDICIAL EVIDENCE.  [U.S. CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE 1, PARAGRAPH 10].

A.    PREJUDICIAL VIDEO OF . . . DEFENDANT.

B.    PREJUDICIAL PHOTOGRAPHS OF THE VICTIM.

POINT XI

THE DEFENDANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY IMPROPERLY CONDUCTED VOIR DIRE PROCEEDINGS.    [U.S. CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

A-1137-17T3

POINT XII

THE DEFENDANT'S RIGHT AGAINST DOUBLE JEOPARDY WAS VIOLATED BY THE TRIAL JUDGE'S IMPROPER DECLARATION OF A MISTRIAL. [U.S. CONSTITUTION, AMENDMENT V, VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 11].

POINT XIII

THE TRIAL JUDGE ERRED IN NOT INCLUDING THE DEFINITION OF NEGLIGENT WHEN CHARGING THE JURY. [U.S. CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

POINT XIV

THE FINDING OF GUILT AS TO COUNT 4 OF THE INDICTMENT WAS BASED ON ILLEGALLY OBTAINED EVIDENCE AND AN ENTRAPMENT PERPETRATED BY THE VICTIM. [U.S. CONSTITUTION, AMENDMENT IV AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 7 AND 10].

POINT XV

THE CUMULATIVE EFFECT OF NUMEROUS ERRORS RESULTED IN AN UNFAIR TRIAL FOR THE DEFENDANT. [U.S. CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

A-1137-17T3

POINT XVI

THE DEFENDANT SUFFERED AN UNFAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL. [U.S. CONSTITUTION, AMENDMENT VI AND XIV; N.J. CONSTITUTION, ARTICLE I, PARAGRAPH 10].

We are unpersuaded by defendant's contentions and for the reasons that follow, we affirm.

I.

Defendant and the victim started dating in 2013 and began living together in September 2014 in a second-floor apartment that defendant leased. At the time of the incident, according to the victim, defendant did not drink alcohol as he was a recovering alcoholic who attended Alcoholic Anonymous meetings and, for that reason, alcohol was not kept in the apartment. In fact, she never saw defendant drink alcohol at any time. On December 31, 2014, there was nothing about defendant that made the victim think defendant had been drinking.

On that day, when the victim left for her 1:00 p.m. to 10:00 p.m. shift at work, she believed she had her apartment keys with her. After her shift ended, the victim went to a bar with coworkers to celebrate her recent promotion. The victim earlier informed defendant that she would be going out with her coworkers after her shift ended. Her failure to return home after work upset

8

defendant who was already concerned that the victim was not being faithful to him.

When the victim arrived back at home at approximately midnight, she realized she did not have her keys, so she started to knock on the door, and called defendant on her cell phone. Defendant never responded so the victim decided to lean against the door and sleep on the floor.

At approximately 5:00 a.m., the victim woke up when defendant opened the door. Defendant immediately started to yell at her and as she got up, defendant pulled at her jacket, attempted to push her over the staircase railing, pulled her into the apartment, slammed the door shut, sat on the victim, and started slapping her in the face with an open hand.

While defendant was slapping the victim, he stated "that this [was] all [the victim's] fault, that he [did not] want to do this, but [she] made him do this to [her]." Anytime the victim attempted to get free, defendant would sit on her chest harder, pin her arms back, or bend her legs so she could not move. She could not scream for help, as defendant also kept putting "his hand over [her] mouth." Defendant started to choke the victim, which caused her to pass out. After she woke up, defendant attempted to console the victim before resuming the beatings by punching her until he eventually got up, locked the front door,

dragged the victim to their bedroom, and continued to beat her on the bed. The victim believed that defendant was going to kill her.

When the beatings suddenly ended, defendant told the victim to go to the bathroom, where he had opened the medicine cabinet so she could not see herself in the mirror. Defendant gave her a washcloth to clean herself, and then he "cleaned up some of the blood that was . . . splattered everywhere." Defendant then grabbed the victim's personal belongings, including her cell phone, computer, credit cards, identification, and the bloody bed sheets on the bed. As he left for work, he told the victim that "it wouldn't be good for [her] to go to the police department or to the police."

When he was gone, the victim was listening for defendant's car to leave when he suddenly stormed back into the apartment and accused her of taking his cell phone. Defendant once again started slapping the victim but stopped when he realized his cell phone was in his pant pocket, which he was wearing at the time.

After defendant left for the second time, the victim waited for defendant to leave before she went to the police station that was across the street from the apartment. At the station, Officer Daniel Kinkler observed that the victim was bleeding onto the floor, and that her "face was extremely swollen, black and blue, [with] eyes swollen so much [he] could just see a slit. [He] couldn't make

out the color of the eyes or anything like that," and because of how bad the injuries were, at first, Kinkler could not even determine if the victim was male or female. The officer radioed for ambulance assistance. Prior to its arrival, the victim informed the officer that defendant was the one that "did this to" her, and Kinkler photographed the victim's face.

After the ambulance left, Kinkler went to the apartment and was joined by then Patrol Sergeant Michael Scardino. There, the officers "noticed blood on a door jamb[,] . . . a little bit of blood on the floor," and that the bed sheets were not on the bed. While at the apartment, Kinkler also observed that there were no bottles of alcohol. Before leaving, Scardino took photographs of the scene.

At the hospital, then Detective Sergeant Bruce Koch and prosecutor's Detective Jose Rosado interviewed the victim. The interview ended when the victim, who was feeling pain everywhere, got sick to her stomach and vomited up blood. The officers were able to obtain information about defendant's location.

A doctor at the hospital treated the victim for multiple contusions and bruises to the face. The victim did not experience any fractured bones. It was ultimately determined that she suffered from Post-Concussive Syndrome, headaches, had

11

undergone six sessions of occupational therapy, and was being treated by a neurologist for chronic headaches.

In the meantime, after defendant left the apartment, and before going to work, he allegedly went to a friend's residence at approximately 5:30 a.m. The friend had known him for over twenty years and knew what he was like when he got drunk. According to the friend, defendant was drunk when she saw him as he was slurring his words, stumbling, and she could smell alcohol on him. She was concerned about defendant driving to work and working while intoxicated.

Later that day, Koch and Scardino arrested defendant at his place of employment.[1] Scardino read defendant his Miranda rights[2] and obtained permission from defendant to search defendant's vehicle, which resulted in the discovery of the bed sheets and the victim's personal items, but no bottles of alcohol.

At the police station, Kinkler processed defendant, and, based on his training, the officer concluded defendant was not under the influence of alcohol at that time and that a blood alcohol test was not necessary. Scardino provided

---

[1] On the same day, a municipal court entered a temporary restraining order under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, barring defendant from having any contact with the victim.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

defendant with his <u>Miranda</u> rights and also concluded that he could not detect alcohol in defendant's system, although he did not know whether defendant was drinking the night before. Rosado stated that there was nothing to make him believe defendant had recently drank after the incident.

Koch and Rosado then interviewed defendant. The interview was recorded on video tape. According to Koch, defendant's speech was clear, and at no time did Koch think defendant was under the influence of alcohol. In the video statement, defendant stated that prior to December 31, 2014, he told the victim not to come back to the apartment because they had trust issues. According to defendant, the victim had been inappropriately talking to another man. The trust issues led the victim to install a tracking application on her cell phone so she could regain his trust.

Defendant stated that on December 31, 2014, the victim was supposed to come back to his apartment after work but because she went out with her friends, he told her not to come back. He stated that the situation was too much for him, which caused him to drink. Defendant stated, "that he had [drank] very heavily during the night before he came across [the victim] and that he had blacked out." According to defendant, because he had not consumed any alcohol for over a

year and because he drank so much, he did not recall many of the things that took place when the victim returned home.

Nevertheless, defendant explained how the victim tried to force her way back into the apartment, he tried to get her back out, and he "panicked and . . . tried to cover her face," which caused the victim to start hitting defendant. After looking at her phone and seeing that she deleted text messages, he "started hitting her in her face" with an open hand. He admitted to hitting her more than once and to tracking her on the cell phone application. Defendant stated that he hit the victim approximately eight times and he recalled the conversation they had while he was hitting her. He even recalled opening the medicine cabinet to prevent the victim from seeing her face start to swell and getting her a bag of french fries from the freezer to help with the swelling. Defendant further stated that he took the bed sheets with him to work "[b]ecause [he] knew how much it meant to her" since "she was really excited to get [it] as a gift." He also admitted to taking the victim's personal items but could not recall why he did that.

Defendant denied telling the victim not to go to the police but stated that he knew she was going to go to the police. He said he felt "shame for . . . hitting her," and "that it wasn't [his] intention to seriously hurt" the victim.

A-1137-17T3

In the meantime, after leaving the hospital, the victim stayed with a friend until she returned to the apartment on January 2, 2015. When she returned, she did not notice any alcohol in the apartment.

A few days after her return, defendant, who had been ordered not to contact the victim, called the victim while he was in jail and told her not to talk to the police. The call was video and audio taped by corrections officers.

During the call, defendant asked the victim to "hear [him] out," the victim stated "[y]ou're not supposed to call me," defendant apologized for what he did, and stated that he was "going to kill [himself]," and he could not live like this. Defendant started to state that "[i]t hurt [him] so bad when [he] found out" what the victim did to him and again reiterated that the victim "hurt [him] so bad." He asked the victim that "[i]f [he did not] talk to . . . anybody else again, just let everybody know that . . . [he] love[s] them." After the victim stated that she was going to press charges, defendant stated "[p]lease don't do that." He further stated "just please don't testify in court. Please just don't." Defendant indicated that he and his family could not "take this." Afterwards, the victim spoke to Koch about the phone call she received from defendant. Defendant was later charged with an additional offense relating to the call.

Thereafter, a Grand Jury returned an indictment charging defendant with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (Count 1); third-degree tampering with witness and informants, N.J.S.A. 2C:28-5(a) (Count 2); fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(a)(1) (Count 3); third-degree tampering with witnesses and informants, N.J.S.A. 2C:28-5(a)(1) (Count 4); and fourth-degree criminal contempt, N.J.S.A. 2C:29-9(b) (Count 5).[3]

Defendant's first trial ended in a mistrial on February 22, 2017.[4] The second trial began on May 2, 2017. At the end of the State's case, defendant moved for a judgment of acquittal, which the court denied. The jury convicted defendant of Counts 1 through 4. The State moved to dismiss Count 5, which the court granted. On July 21, 2017, the trial court granted the State's motion for sentencing in the extended term, and then imposed an aggregate sentence of twenty-four years, subject to a parole ineligibility period under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. This appeal followed.

---

[3] Counts 1 to 3 related to the events of December 31, 2014, while Counts 4 to 5 related to the phone call defendant made to the victim on January 6, 2015.

[4] As the trial court found at the time, the mistrial was required after Koch mistakenly mentioned the domestic violence restraining order in response to a question on direct examination that did not call for its disclosure.

## II.

## Intoxication

## A.

We begin our review by addressing defendant's arguments stated in Point I of his merits brief and in Point V of his supplemental brief relating to his claim that he was too intoxicated at the time he beat the victim to be held accountable for his actions. His first contention is that the trial court committed reversable error by refusing to charge the jury with Model Jury Charges (Criminal), "Intoxication Negating an Element of the Offense (N.J.S.A. 2C:2-8a)" (rev. Oct. 8, 2005). Defendant asserts that his video statement and the testimony of his friend with whom he met with after beating the victim supported his request for the charge. He argues that with this evidence, "a rational jury could find his faculties were so prostrated by his consumption of alcohol that he was rendered incapable of purposeful or knowing conduct." We disagree.

In refusing to charge the jury with the intoxication defense, because there was insufficient evidence to support the defense, the trial court relied heavily upon the detailed statement defendant gave to the police about the incident. Those details included what he said while he beat the victim, the different manners in which he struck her, the description of the victim's injuries he saw

A-1137-17T3

develop during the encounter, the precise food he took from the refrigerator to give to her when the beating stopped, and the description of how and why he removed the sheets and the items he took from the victim before leaving. Yet, in the same statement, defendant never mentioned any details about how much alcohol he consumed, where or when he acquired it, and over what time he consumed the alcohol.

It is well settled that "[a]ppropriate and proper [jury] charges are essential" in a criminal case to assure a fair trial. State v. Reddish, 181 N.J. 553, 613 (2004) (first alteration in original) (quoting State v. Green, 86 N.J. 281, 287 (1981)). Jurors must be instructed on the defense of intoxication where "the requisite culpability for a crime is that the person act 'purposely' or 'knowingly,' [and there is] evidence of voluntary intoxication [that] is admissible to disprove that requisite mental state." State v. Cameron, 104 N.J. 42, 53 (1986).

In order to disprove the requisite mental state, the evidence must demonstrate "that defendant's 'faculties' were so 'prostrated' that he or she was incapable of forming an intent to commit the crime." State v. Mauricio, 117 N.J. 402, 418-19 (1990). "[U]nless the evidence [meets] that standard, the issue should not be presented to the jury." State v. Zola, 112 N.J. 384, 424 (1988) (citing Cameron, 104 N.J. at 54-57). Before refusing to deliver the requested instruction, a trial

court must determine whether "viewing the evidence and the legitimate inferences to be drawn therefrom in the light most favorable to defendant, . . . there is no suggestion in the evidence that defendant's faculties were so [affected] . . . as to render [defendant] incapable of purposeful or knowing conduct." Ibid. (second and fourth alterations in original) (quoting State v. Breakiron, 108 N.J. 591, 617 (1987)).

In Cameron, the Supreme Court addressed the extreme level of intoxication necessary to satisfy the "prostration of faculties" test. 104 N.J. at 54. The Court stated:

> [I]t is not the case that every defendant who has had a few drinks may successfully urge the defense. The mere intake of even large quantities of alcohol will not suffice. Moreover, the defense cannot be established solely by showing that the defendant might not have committed the offense had he been sober. What is required is a showing of such a great prostration of the faculties that the requisite mental state was totally lacking. That is, to successfully invoke the defense, an accused must show that he was so intoxicated that he did not have the intent to commit an offense. Such a state of affairs will likely exist in very few cases.
>
> [Ibid. (alteration in original) (citation omitted) (quoting State v. Stasio, 78 N.J. 467, 495 (1979) (Pashman, J., concurring and dissenting)).]

19

Further, the Court described "some of the factors pertinent to the determination of intoxication sufficient to satisfy the test of 'prostration of faculties.'" Id. at 56. Those factors included:

> [T]he quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others (what he said, how he said it, how he appeared, how he acted, how his coordination or lack thereof manifested itself), any odor of alcohol or other intoxicating substance, the results of any tests to determine blood-alcohol content, and the actor's ability to recall significant events.
>
> [Ibid.]

Applying the "prostration of faculties" test, we previously held that a defendant's statement that he drank excessively at the time the crime was committed was "entirely insufficient to establish the extremely high level of intoxication required by the [c]ourt to qualify as a defense as well as to create a jury question on defendant's intoxication." State v. R.T., 411 N.J. Super. 35, 50-51 (App. Div. 2009), aff'd, 205 N.J. 493 (2011). Similarly, the Supreme Court has held that a defendant's reliance upon a doctor who stated, "defendant had been increasingly dependent on drugs and alcohol; on evidence that defendant had stolen and used a gram of methamphetamine on the day of the crime; and on the testimony of defendant's girlfriend that she knew defendant

20

frequently used methamphetamine and had often seen him using marijuana" was insufficient to warrant the charge. Zola, 112 N.J. at 423-24.

Applying the test here, we conclude the trial court correctly denied defendant's request to charge the intoxication defense because there was insufficient evidence to support the request. Here, the victim testified that she had never seen defendant drink alcohol and when he attacked her, she did not sense an odor of alcohol, or observe any bottles or anything else to indicate that defendant was under the influence at that time. Moreover, the search of defendant's apartment and car did not yield any evidence of alcohol consumption. Other than defendant and his friend, every witness "who observed him . . . before [and after] the crime testified that he did not appear to be intoxicated and defendant's [recorded statement to police] showed a clear and detailed recollection as to the events." Zola, 112 N.J. at 425. In defendant's detailed statement, he not only admitted to hitting the victim, but he also described how he hit the victim, where he hit the victim, what he did to clean the apartment, and what he did when he left the apartment. The only evidence of defendant's intoxication was his statement to police and his friend's observations, neither of which demonstrated a prostration of defendant's

21

faculties. We have no cause to disturb defendant's conviction based on this contention.

B.

Next, we consider defendant's arguments in Point II of his merits brief about the limitations imposed by the trial court on the scope of his expert's, Dr. Peter Oropeza, testimony at trial. Prior to trial, the court conducted a Rule 104 hearing to determine the extent of Oropeza's testimony. Oropeza, a forensic psychologist, testified that he was asked to conduct a psychological evaluation of defendant in 2016. Based on his evaluation, Oropeza concluded that defendant suffered from a bipolar disorder.

After reviewing defendant's personal history dating back to the 1990s, Oropeza opined that defendant had "a longstanding history of . . . untreated mental illness[ and] very poor coping skills." He testified defendant "was not able to knowingly and purposefully act out" on December 31, 2014 "due to a combination of his mental illness and his . . . substance abuse, including alcohol." In reaching that conclusion, Oropeza relied upon defendant telling him that "he drank approximately half a gallon of vodka" on December 31, 2014, up until the point that he passed out, which prevented defendant from recalling what happened.

A-1137-17T3

On cross-examination, Oropeza, acknowledged that he did not "review anything with regard to [defendant's] blood alcohol content," but instead relied upon what defendant had told him in the evaluation and the statement defendant gave to the police. The doctor could not determine whether defendant acted recklessly, as he was not asked to make that determination. While the doctor conceded that his report never opined about whether defendant purposely or knowingly removed all of the victim's items from the apartment, removed the sheets, and cleaned off the blood from the apartment, he testified that "[i]t sounds like he[ knew] what he[ was] doing in reference to that."

The trial court found Oropeza to be credible, and "by the thinnest of . . . testimony," the court "permit[ted] the doctor to testify as to the diminished capacity defense, that there [was] a mental disease or defect that may negate the mental state that is an element of the offense." The court would however, "not permit[] testimony as to [defendant's] alcohol consumption [on the night of the incident] absent an[y] support." The court permitted Oropeza to testify that "defendant could not knowing[ly], purposely or was not able to form . . . the requisite intent due to his mental illness."

At trial, Oropeza again testified to the information and opinions he discussed at the Rule 104 hearing, including his statements about defendant's history of

23

alcohol abuse. He also explained in preparing his report that he spoke to defendant and defendant's mother, he reviewed defendant's psychiatrist's opinions, and that "[a]t the time of the offenses," defendant had an "untreated" "bi[]polar disorder" and "[a]n alcohol dependency problem." In his professional opinion, defendant could "not knowingly and purposely attempt to cause serious bodily injury."

On cross-examination, Oropeza again stated that defendant told him that he had "ingested an approximate level of a half gallon of vodka" on December 31, 2014. He also stated that while he was asked to opine on whether defendant's "mental issues or his alcohol intake effected his ability to act purposely or knowingly," he was never asked to prepare a report about whether defendant acted recklessly. Oropeza explained that it was the "combination of an untreated bi[]polar condition and . . . severe alcohol intoxication [that led] to [his] opinion that there wasn't knowing or purposeful attempts to cause severe bodily injury."

On appeal, defendant argues that the trial court should not have prevented defendant's "expert from testifying that intoxication was part of the foundation for his medical opinion," "[e]ven with [the] court finding that intoxication should not be charged." By only allowing Oropeza to testify about defendant's bipolar disorder, and not to testify about defendant's "prior alcohol

24                                                                    A-1137-17T3

dependenc[y], his addiction to alcohol and his intoxication [on] that night" of the incident, did not allow the jury to fully understand "the true nature of [Oropeza's] expert opinion" and his diminished capacity.

We conclude that the premise of defendant's argument about Oropeza is simply incorrect.  Here, the trial court permitted Oropeza to testify about how defendant's history of mental disorder and substance abuse could have impacted defendant on the night of the incident.  Even though the witness had been previously barred from testifying that defendant drank on the night of the incident, the doctor told the jury what defendant had told him about the amount of alcohol he consumed that night.  The trial court specifically stated that unlike determining whether defendant's "faculties were [so] prostrated" to warrant the intoxication defense charge, the lack of proof of intoxication was not a bar to Oropeza testifying about the effects of defendant's alcoholism and mental disorder.  For that reason, Oropeza was permitted to testify about defendant's allegation that he consumed alcohol and how defendant's psychological and substance abuse issues prevented defendant from purposely or knowingly committing an aggravated assault.  Contrary to defendant's contention, the trial court did not impede the doctor's testimony or defendant's defense and later it appropriately charged the jury with diminished capacity.  Model Jury Charges

(Criminal), "Evidence of Mental Disease or Defect (N.J.S.A. 2C:4-2)" (rev. June 5, 2006).

Next, we address defendant's contention in Point III of his merits brief that the trial court improperly barred his mother from testifying at trial to rebut the victim's testimony that she never saw defendant drink alcohol. The court's ruling arose after it ordered witnesses to be sequestered at the beginning of the trial, and defendant's mother, who was not identified as potential witness, sat through each day's proceedings, but was then proffered as a rebuttal witness by defendant. Specifically, counsel wanted to introduce, through the mother, text messages that she exchanged with the victim on August 30, 2014, about their mutual concern that defendant had possibly gone on a "binge."

In response to the proffer, the trial court initially ruled that to allow the mother to testify would be a violation of its sequestration order. Moreover, it found that the text messages did not "indicate anything other [than] that there was a concern that [defendant] was missing and [the messages did not] indicate in there that [the victim] had seen him drink or that he was drinking." Therefore, the messages did not "say anything . . . that would be different than what [the victim] testified to." Furthermore, since the mother would not be able to

26

separate what she already heard from her proposed testimony, the trial court would not allow her to testify.

The next day, before the victim's cross-examination began, the court discussed the text messages having reviewed them again the night before. The court read a specific portion of the messages, in which both the mother and the victim expressed concerns about defendant's whereabouts at the time, and, as the mother stated, that, defendant was "going on a binge . . . and [she was] sick with worry." Although the victim shared the concern, she never stated in the text messages that she saw defendant drinking at any time.

After reading the text messages, the trial court reiterated its ruling from the prior day that the messages were inadmissible, and the mother could not testify. The court stated that the messages were "lacking of completeness," as they did not have time stamps from the messages, the court was skeptical about whether it was given the full text of the conversation, and it did not find the messages to be reliable. These concerns in combination with the mother being present in the courtroom resulted in the court barring the mother from testifying or admitting the text messages in as evidence. However, the court allowed defense counsel to cross-examine the victim about the text messages, but the victim expressed difficulty in remembering the exchange.

27

On appeal, defendant argues that even with the sequestration order in place, it was reversible error not to allow defendant's mother to rebut the victim's testimony that the victim never saw defendant drink alcohol.  He further argues that the trial court "should have considered alternative remedies," such as a jury instruction about the mother's violation of the order.

We conclude that defendant's contentions are without sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).  We only observe that even if there was an error in barring the mother from testifying or admitting the text messages, see State v. Dayton, 292 N.J. Super. 76, 91 (App. Div. 1996); State v. Horton, 199 N.J. Super. 368, 373-74 (App. Div. 1985), the error, if any, was harmless.  R. 2:10-2.  As the trial court concluded, there was nothing in the proffered text messages to support any contention that defendant was intoxicated at the time he repeatedly beat the victim four months after the text message exchange or that the victim ever witnessed defendant drink alcohol.  Moreover, nothing prevented defendant from naming his mother as a witness with knowledge about history of alcoholism.  Had he done so, she too would have been sequestered and would have been allowed to testify.  The trial court's order in this regard was consistent with the purposes of sequestration, see N.J.R.E. 615; State v. Williams, 404 N.J. Super. 147, 159-60 (App. Div. 2008); State v.

28

Miller, 299 N.J. Super. 387, 399 (App. Div. 1997), and did not constitute an abuse of the trial court's discretion.

## III.

## Additional Jury Charges

Defendant contends in Points V and XIII of his supplemental brief, that the trial court failed to "sua sponte charge the jury with causation with respect to" how the victim acquired her migraines and headaches because the jury may have found that the victim caused her own injuries. He also argues that the trial court should have instructed the jury on self-protection, N.J.S.A. 2C:3-4(a) and use of force in defense of premises and personal property, N.J.S.A. 2C:3-6(a). Finally, defendant contends that the trial court failed to include negligence as one of the mental states required for aggravated assault.

Here again, we conclude defendant's contentions are without any merit and do not warrant further discussion. R. 2:11-3(e)(2). Succinctly, no request was ever made for these charges and defendant did not interpose an objection to the court's charge as delivered, other than the omission of the intoxication defense. "A claim of deficiency in a jury charge to which no objection is interposed 'will not be considered unless it qualifies as plain error . . . .'" State v. R.B., 183 N.J. 308, 321 (2005) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).

A-1137-17T3

"[V]iew[ing] . . . the totality of the entire charge, not in isolation," State v. Chapland, 187 N.J. 275, 289 (2006), we find no prejudicial error, State v. Coruzzi, 189 N.J. Super. 273, 312 (App. Div. 1983), or anything in the record to warrant that any of the cited charges be given to the jury. Defendant's contention about negligence is without any legal basis.

IV.

Weight of the Evidence

We turn our attention next to defendant's contention in Point IV of his merits brief and Point VI of his supplemental brief that the trial court erred by denying his motion for "a new trial at the conclusion of the State's case." He argues the State failed to meet its burden of establishing a prima facie case, and to not set aside the jury verdict would be a "manifest denial of justice under the law." As to the indictment's first count, he argues that the injuries sustained by the victim did not "create a risk of death or cause the victim any permanent injury." He asserts that the State failed "to satisfy the injury requirement of N.J.S.[A.] 2C:21-1(b)(1)," and therefore he cannot be found guilty of aggravated assault. Instead, defendant contends that he should have been found guilty of simple assault.

As to the tampering counts, defendant first argues that Count 2, N.J.S.A. 2C:28-5(a) and Count 3, N.J.S.A. 2C:28-6(1) do not apply to his conduct as defendant "never had any reason to believe that 'an official proceeding or an investigation [was] pending or about to be instituted or [had] been instituted,'" when he demanded the victim not go to the authorities. As to Count 4, defendant asserts that the phone call made while in prison does not provide evidence that defendant "requested or attempted to get the victim 'to testify or inform falsely'" under N.J.S.A. 2C:28-5(a)(1).

At the outset, we conclude that to the extent defendant contends that the verdict was unsupported by the evidence at trial, we will not consider his contention as he never filed a motion for a new trial. See R. 2:10-1; State v. Fierro, 438 N.J. Super. 517, 530 (App. Div. 2015). We therefore limit our review to the question of whether the trial court correctly denied his motion for acquittal at the end of the State's case, after giving the State on its case "the benefit of all its favorable testimony" and "all of the favorable inferences . . . , a reasonable jury could find guilt . . . beyond a reasonable doubt." State v. Wilder, 193 N.J. 398, 406 (2008) (second alteration in original) (quoting State v. Reyes, 50 N.J. 454, 459 (1967)); R. 3:18-1.

As to the charge of aggravated assault, the victim and the investigating police officers testified to the victim's injuries, which were also illustrated by photographs taken at the time. In her testimony, the victim explained not only how defendant beat and choked her until she passed out, but also because of what defendant did to her, she continued to suffer from headaches and migraines, which began shortly after the incident, and for which she received treatment from a neurologist who prescribed medication as well. She also began working with an occupational therapist who helped with her inability to recall and "processing information from multiple sources at one time." There were days the pain was so bad that she could not even stand to hear her therapist speak to her. Although she had improved somewhat by the trial date, the victim still experienced difficulty processing information. Moreover, although the victim stated that her neurologist initially thought that the victim's use of a pain reliever may have caused some of her headaches, after she stopped taking the medication, the headaches and migraines still continued.

Contrary to defendant's contentions on appeal we conclude from our de novo review, State v. Dekowski, 218 N.J. 596, 608 (2014); State v. Williams, 218 N.J. 576, 593-94 (2014), that there was sufficient evidence to warrant the denial of his motion as to Count 1. That count charged defendant with second-degree

32

aggravated assault by "[a]ttempt[ing] to cause serious bodily injury to another, or caus[ing] such injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury."  N.J.S.A. 2C:12-1(b)(1).  The jury ultimately found defendant guilty for causing the victim to sustain a serious bodily injury.

"Serious bodily injury," is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." N.J.S.A. 2C:11-1(b) (emphasis added); see State v. Bey, 129 N.J. 557, 579-80 (1992) (explaining that attempting to strangle "a form of violence designed and likely to kill a victim, and" more significant than attempting "to inflict serious bodily injury"), supplemented by 137 N.J. 334 (1994); State v. Turner, 246 N.J. Super. 22, 27 (App. Div. 1991) (holding that a laceration to a victim's throat "unquestionably subjected the victim 'to a substantial risk of death'" (quoting State v. Williams, 197 N.J. Super. 127, 132 (App. Div. 1984))).  In considering what constitutes a serious bodily injury, courts should consider "the injury . . . in the eyes of the beholder," "how the injury affected the victim's daily life and normal activities," and how the "condition was protracted, prolonged or extended in time."  State v. Kane, 335 N.J. Super. 391, 398-99 (App. Div. 2000).

Applying these guiding principles to the testimony and other evidence adduced on the State's case, we conclude that there was sufficient evidence "to warrant a conviction" on the charge of aggravated assault. Defendant's act of repeatedly beating the victim to the point she was not recognizable, attempting to throw the victim over the staircase railing, and choking the victim, which caused her to pass out and created a substantial risk of death. Similarly, the testimony at trial confirmed that the victim suffers from ongoing pain and suffering through her migraines, headaches, and difficulty processing information. The severity of victim's pain constitutes a protracted loss of bodily function that has persisted for years since the incident.

We reach a similar conclusion as to the tampering related charges. In Count 2, defendant was charged with subsections one, two, and five of tampering with witnesses, N.J.S.A. 2C:28-5(a), which are third-degree offenses if a person "believing that an official proceeding or investigation is pending or about to be instituted . . . cause[s] a witness or informant to . . . [t]estify or inform falsely; . . . [w]ithhold any testimony, information, document or thing; . . . or . . . [o]therwise obstruct, delay, prevent or impede an official proceeding or investigation." Ibid. Further, in Count 3, defendant was charged with tampering with physical evidence, N.J.S.A. 2C:28-6(1). That section of the criminal code

34

makes it a fourth-degree offense where a person who "believ[es] that an official proceeding or investigation is pending or about to be instituted, . . . [a]lters, destroys, conceals or removes any article, object, record, document or other thing of physical substance with purpose to impair its verity or availability in such proceeding or investigation." Ibid.

At trial, on the State's case, the victim testified that defendant told her not to go to the police and took her personal belongings, including her cell phone, and in defendant's recorded statement, he admitted that he removed the bloody bed sheets from the scene, which provided sufficient evidence to sustain convictions for tampering with a witness and physical evidence under Count 2 and Count 3. Defendant's argument on appeal that he did not know a proceeding was about to be instituted is belied by the record. In defendant's statement to the police that was played for the jury, he specifically stated that he knew the victim was going to go to the police. The denial of his acquittal motion in this regard is unassailable.

Last, we consider defendant's arguments as to Count 4 that charged him with tampering with a witness, N.J.S.A. 2C:28-5(a)(1). According to defendant, the phone call he made while in jail did not provide sufficient evidence that

defendant "requested or attempted to get the victim 'to testify or inform falsely'" under N.J.S.A. 2C:28-5(a)(1). We disagree.

On this count, defendant was charged under N.J.S.A. 2C:28-5(a)(1), which involves engaging in conduct that "a reasonable person would believe would cause a witness or informant to . . . [t]estify or inform falsely." In order to be guilty of this crime, a defendant need only "approach[] the witness rather than . . . successfully convincing that witness not to testify or to alter such testimony." State v. Speth, 323 N.J. Super. 67, 87 (App. Div. 1999).

When defendant made the jailhouse phone call to the victim, he was under a court order not to contact her. At the time, he was fully aware that there was at least an investigation being conducted as he already participated in it by giving his statement to police, and he intended through the phone call to persuade the victim to inform the police that what she had already told them was not true.

V.

Validity of the Indictment and the Verdict Sheet

In the arguments stated in Point I through IV of his supplemental brief, challenging the language of the indictment and contents of the verdict sheet, defendant cites to alleged flaws in both that were never raised before the trial court. Under these circumstances, we review his contentions for plain error, that

36

is, error "clearly capable of producing an unjust result." R. 2:10-2; State v. Munafo, 222 N.J. 480, 488 (2015) (quoting R. 2:10-2). A conviction will be reversed under this standard only if the error is "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Taffaro, 195 N.J. 442, 454 (2008) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Applying that standard, we conclude defendant's claims here, including his constitutional challenge to N.J.S.A. 2C:12-1(b), are also without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Although defendant attempts to couch some of his arguments as claims that the indictment did not charge him with certain offenses, as discussed in Rule 3:10-2(d), they are actually assertions of defects in the indictment as provided for under Rule 3:10-2(c). As such, his claims are waived because he did not raise those concerns before trial, and he has failed to establish any good cause for a waiver of that requirement. See R. 3:10-2(c) ("[O]bjections based on defects . . . in the indictment . . . must be raised by motion before trial."). Additionally, to the extent defendant argues that the trial court delivered outdated jury charges as to N.J.S.A. 2C:28-5 in Point III of his supplemental brief, we conclude any such error was harmless in that requiring the juror to determine his guilt in accordance

with a charge that imposed on the State a higher burden of proof did not cause an unjust result.[5]

## VI.

## Admission of Evidence

In Points X and XIV of his supplemental brief, defendant argues that the trial court erred by admitting into evidence the photographs of the victim's injuries and the video of him in prison garb making the telephone call to the victim. He also asserts that testimony about the phone call should not have been admitted because he was entrapped through the victim's unauthorized use of his credit card in accepting the call from him and through law enforcement's involvement in the call. Here, again defendant raises arguments that were not brought to the trial court's attention.

---

[5] The model jury charge pre-2008, see Model Jury Charges (Criminal), "Tampering with Witnesses and Informants (N.J.S.A. 2C:28-5a) (Cases arising before September 10, 2008)" (rev. Jan. 12, 2009), required the State to prove that "beyond a reasonable doubt that defendant . . . knowingly caused [witness] [informant] to" commit some act. Ibid. (second and third alteration in original). The post-2008 jury charge required only that defendant "knowingly engaged in conduct that a reasonable person would believe would cause a [witness] [informant] to" commit a certain act. See Model Jury Charges (Criminal), "Tampering with Witnesses and Informants (N.J.S.A. 2C:28-5a) (Cases arising after September 10, 2008)" (rev. Mar. 16, 2009) (alterations in original) (emphasis added).

A-1137-17T3

We again conclude defendant's arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Moreover, we discern no error, let alone plain error, in the admission of the video or the photographs which were admitted into evidence without any objection, and apparently were highly probative of elements of the crimes with which defendant was charged. As to entrapment, assuming his claim is viable, we cannot find any evidence in the record to support defendant's contention. See State v. Johnson, 127 N.J. 458, 464 (1992) (stating a defense of entrapment can arise "whenever a defendant introduces evidence of the government's involvement in the crime through initiation, solicitation, or active participation").

## VII.

## Voir Dire

We turn our attention to defendant's arguments in Point XI of his supplemental brief about the selection of the jury. According to defendant, voir dire proceedings were improperly conducted as "prospective jurors were disproportionately excused by the [t]rial [court] in a discriminatory fashion based on their revealed biases." Specifically, he contends that the trial court "disproportionately excus[ed] jurors for revealed bias[s] against believing law enforcement while not doing the same for those with revealed bias for believing

law enforcement." Defendant asserts that the trial court's actions forced his counsel to use peremptory challenges in a number of instances.

Defendant was given twenty peremptory challenges and the State was given twelve. During voir dire, individuals that were biased for and against law enforcement were excused from the jury panel.

In one instance, defense counsel challenged a juror for cause who he believed was biased, after the prospective juror stated that her daughter was a corrections officer but that it would not "affect [her] ability to be fair and impartial in this case," even though she was unsure of whether she would give more weight to the testimony of law enforcement over another witness. However, when the court asked her whether she would be able to "listen to all the testimony that's presented . . . and make a decision upon . . . [t]estimony as it's presented regardless if they're law enforcement or not law enforcement," the prospective juror said she could.

Defense counsel followed up and asked the prospective juror whether she thought "a person who works for law enforcement[ was] more likely to be truthful when they testify as opposed to somebody who doesn't work in law enforcement." The juror responded by stating that "I would say I would hope to believe that . . . [law enforcement] would be more truthful." The court wanted

to clarify what the prospective juror meant and asked, "would you tend to believe that law enforcement would be more likely to tell the truth merely because they are law enforcement," to which she stated "[y]es." She then stated that she "would . . . be able to wait and listen to the testimony and make a decision based upon how someone testifies whether it be law enforcement or . . . not law enforcement."

At sidebar, defense counsel challenged the juror for cause, stating that "because this woman clearly ha[d] a . . . preconceived notion that law enforcement is more likely to tell the truth." The court stated that her conflicting answers were due to the manner in which defense counsel asked his question, and the court believed the prospective juror would be fair and impartial. Defendant used a peremptory challenge to excuse the juror and later exhausted his remaining challenges.

In a different situation, the trial court excused a potential juror for cause after he stated that "police officers protect police officers," and in his experience with police officers, he "just [saw] them to be less truthful, because they choose things that are discriminatory in [his] mind." The prospective juror was excused even though he stated that he would "pray" he could separate his opinions from his consideration of the evidence. At the time the juror was excused, defense

41

counsel stated that it was improper to dismiss the prospective juror without allowing him a chance to rehabilitate the juror. The court disagreed.

We begin our review by acknowledging that jury selection plays an integral role in ensuring a defendant "is constitutionally guaranteed the right to trial by an impartial jury." State v. Bianco, 391 N.J. Super. 509, 517 (App. Div. 2007). In our review of decisions relating to the jury, we are guided by the principle that "[a] defendant's right to be tried before an impartial jury is one of the most basic guarantees of a fair trial." State v. Loftin, 191 N.J. 172, 187 (2007). "A trial is poisoned at its inception if the jurors deciding the case cannot review the evidence dispassionately, through the light of reason." Ibid. (quoting State v. Fortin, 178 N.J. 540, 575 (2004)). Litigants are entitled to "an unbiased jury and . . . a fair jury selection process." Pellicer ex. rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 40 (2009).

We leave the selection and management of the jury to the sound discretion of the trial court. State v. Brown, 442 N.J. Super. 154, 182 (App. Div. 2015). "This standard respects the trial court's unique perspective and the traditional deference we accord to [it] in 'exercising control over matters pertaining to the jury.'" Ibid. (quoting State v. R.D., 169 N.J. 551, 560 (2001)).

Voir dire determinations "are traditionally within the broad discretionary powers vested in the trial court and 'its exercise of discretion will ordinarily not be disturbed on appeal.'" State v. Murray, 240 N.J. Super. 378, 392 (App. Div. 1990) (quoting State v. Williams, 113 N.J. 393, 410 (1988)). In the selection of a jury, "trial courts must be allotted reasonable latitude when conducting voir dire and, therefore, [our] examination . . . focus[es] only on determining whether 'the overall scope and quality of the voir dire was sufficiently thorough and probing to assure the selection of an impartial jury.'" State v. Winder, 200 N.J. 231, 252 (2009) (quoting State v. Biegenwald, 106 N.J. 13, 29 (1987)). Accordingly, we will not reverse a trial court's decision regarding removal of a juror for cause "unless the court has abused its discretion." State v. DiFrisco, 137 N.J. 434, 459 (1994).

"'[A] thorough voir dire,' . . . presupposes that prospective jurors will provide complete and accurate responses . . . ." Bianco, 391 N.J. Super. at 517 (citation omitted). Generally,

> [t]he purpose of jury selection is to obtain a jury that can decide the case without bias against any of the involved parties, that will evaluate the evidence with an open mind, and that will apply the law as instructed by the judge. Voir dire practices must be geared to eliciting meaningful information from prospective jurors so those with a real potential for bias can be excused.

A-1137-17T3

[Ibid. (quoting Administrative Directive #21-06, "Approved Jury Selection Standards" (Dec. 11, 2006)).]

Although a trial court is "not obliged to ask any particular question or indulge the defendant's requests absolutely," State v. Lumumba, 253 N.J. Super. 375, 394 (App. Div. 1992), when "clear and accurate answers from prospective jurors are not encouraged through a thorough and meaningful process, counsel may be hampered, if not foreclosed, from learning of a basis for excusing the prospective juror for cause or by peremptory challenge," Bianco, 391 N.J. Super. at 518 (quoting Administrative Directive #21-06).

The decision to remove a juror for cause in response to a prospective juror's answers to the court's questions requires a showing that the juror's views would "prevent or substantially impair the performance of that juror's duties in accordance with the court's instructions and the juror's oath." DiFrisco, 137 N.J. at 469. The goal is to seat a juror who, despite a disclosed and acknowledged bias, commits himself or herself to being impartial and following the judge's instructions. See Winder, 200 N.J. at 251-53; State v. Fuller, 182 N.J. 174, 203-04 (2004); State v. Williams, 93 N.J. 39, 61 (1983); Brown, 442 N.J. Super. at 182-84.

In order "for [a] forced expenditure of a peremptory challenge to constitute reversible error . . . , a defendant must demonstrate that a [partial] juror" participated in deliberations "as a result of . . . defendant's exhaustion of peremptories." DiFrisco, 137 N.J. at 470. To prove that error,

> defendant must show (1) that the trial court erred by failing to remove a juror for cause; (2) that the juror in question was eliminated by the exercise of defendant's peremptory challenge and that defendant exhausted his remaining challenges; and (3) that at least one of the remaining jurors that sat on the jury was a partial juror.
>
> [Id. at 471.]

Applying these guiding principles here, the trial court did not err by not removing her for cause. Moreover, defendant used a peremptory challenge on that prospective juror, and defendant failed to establish that any of the seated jurors were partial. Under these circumstances, we have no cause to disturb the outcome of defendant's trial.

VIII.

Sentencing

In Point V of defendant's merits brief and Point VIII and IX of his supplemental brief, he challenges his sentence as being excessive. He argues that "the court failed to consider appropriate mitigating factors and other circumstances that would have personalized [defendant], and justified a less

severe sentence," and that it "failed to consider [defendant's] mental condition and his alcohol problem as a valid mitigating factor." He also contends that the court erred when it made "the decision to impose two of the four counts consecutively," which "was primarily based upon only one of the [applicable] . . . factors." According to defendant, he should have received "a consecutive sentence for either Count [2] or Count [4,] but not both," as Count 4 should have been concurrent to Count 2. Instead, "the court double counted [the same] aggravating factors when it determined to impose the consecutive sentences" that it had already relied on when sentencing defendant to the extended term and in imposing "a sixteen-year sentence on Count [1] that could have been as low as five years." Accordingly, defendant contends his sentence should be reduced pursuant to the guidelines of State v. Yarbough, 100 N.J. 627 (1985) and policies against excessive sentences. We disagree.

At sentencing, defendant argued sentencing in an extended term was not appropriate and that the court should take into consideration defendant's "long history of mental illness." He urged for the court to consider the expert testimony about defendant's bipolar disorder and alcohol abuse, which did not absolve defendant of guilt, but explained that these problems in combination with the "history of suicide in his family" and the medication he was currently

on, warranted a lesser sentence. Defense counsel also stated, he would "not argue with the fact that the [c]ourt must impose a consecutive sentence on the witness tampering but [he did] argue with the fact that the [c]ourt should impose a discretionary extended term."

In addressing the sentencing factors under N.J.S.A. 2C:44-1(a) and (b), the court found aggravating factor (a)(1) applicable, "[t]he nature and circumstances of the offense," as defendant's attack on plaintiff was "committed in an especially heinous, cruel and depraved manner." The assault occurred for several hours and defendant later attempted to "make it impossible for the victim to call for help or seek assistance." The court rejected the State's request to apply aggravating factor (a)(2), "[t]he gravity and seriousness of the harm inflicted," as it believed its application would be "double counting." It then found applicable and gave great weight to aggravating factor (a)(3), "[t]he risk that . . . defendant [would commit] another crime," since defendant "had many contacts with the court system resulting in three . . . convictions, all on different dates." It also found applicable aggravating factor (a)(6), "[t]he extent of [defendant's] prior criminal record and the seriousness of [those] offenses" and noted that one of defendant's convictions dealt with domestic violence. On "[t]he need [to] deter[] . . . defendant and others," aggravating factor (a)(9), the

47

court also gave "this factor great weight" because defendant's actions demonstrated that he was violent, uncontrolled, devious, and calculating.

The court then reviewed each of the mitigating factors under N.J.S.A. 2C:44-1(b) and explained why none of them were applicable in light of defendant having acted without provocation, his having an extensive criminal history, there being no restitution, or anything to justify defendant's actions. It then found that the aggravating factors outweighed the mitigating factors.

The court, relying on State v. Thomas, 195 N.J. 431 (2008), granted the State's motion to sentence defendant on his aggravated assault conviction in the extended term as a persistent offender under N.J.S.A. 2C:44-3(a). In doing so the court recognized that although the State's motion did not specify which count it sought for imposition of the extended term, the "minimum statutory predicates for subjecting . . . defendant to an extended term [had] been met," and defendant was on notice that the State pursued an extended term.

Additionally, because defendant was at least twenty-one when he committed the crime, he had been convicted before when he was at least eighteen, and in a prior conviction of defendant he stipulated to an extended term, the court concluded an extended term was appropriate in this matter. The court then stated the following:

The [c]ourt specifically finds and emphasizes the need for the protection of the public and society in imposing its sentence today. This protection of the public standard is specifically referenced in State v. Pierce[, 188 N.J. 155, 166-68 (2006),] and in accordance with Pierce this [c]ourt makes said findings after noting defendant's eligibility for extended term and after finding of the aggravating factors previously noted.

The court found defendant was "a true menace to society and . . . the public [would] only be safe from . . . defendant if he was in jail."

Relying on Yarbough, 100 N.J. at 643-44, the court imposed consecutive sentences on Counts 2 and 4 and stated:

The crimes committed by . . . defendant occurred on December 31[], 2014 and January 6, 2015. The crimes committed on each of these dates are independent of each other. They are separate and distinct crimes.

The crimes and their objectives on each of these dates were independent of each other, involved separate acts and were committed at different times and places, therefore, the witness tampering charge in [C]ounts [2] and [4 would] be sentenced consecutively as [was] required under statute.

Further, since Counts 2 and 3 were fundamentally similar and committed at or about the same time, the court held that the sentences on those two counts would run concurrent to each other.

The trial court then revisited the extended term issue and stated that its finding was based on defendant's prior conviction for aggravated assault in another matter that involved domestic violence. The court concluded that:

> In determining the sentence [the court was] about to impose and in addition to the aggravating and mitigating factors and . . . defendant's qualifications for an extended term the [c]ourt considered the following. The nature and degree of the crimes, the need for punishment and deterrence, the defendant's prospects for rehabilitation, the adult pre-sentence report, [defendant's] previous involvement in the criminal justice system, the interest of the public and the submissions and/or arguments of Counsel.

The court sentenced defendant to sixteen years as to Count 1, subject to a parole ineligibility period under NERA, and a consecutive four-year term on Counts 2, an eighteen-month term on Count 3, concurrent to Count 2, and as to Count 4 it imposed a second four-year term consecutive to Count 1 and Count 2.

We review a trial court's imposition of a sentence for abuse of discretion. State v. Robinson, 217 N.J. 594, 603 (2014). In our review, we "are . . . not to substitute [our] judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014). If a sentencing court has followed the sentencing guidelines, based its determination of aggravating and mitigating factors on competent, credible evidence, and applied the sentencing "guidelines to the facts of [the]

50

case" in a manner that does not make the sentence so clearly unreasonable so as to shock the judicial conscience, "an 'appellate court must affirm the sentence.'" State v. Miller, 237 N.J. 15, 28 (2019) (alteration in original) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).

"In exercising its authority to impose [a] sentence, the trial court must identify and weigh all of the relevant aggravating factors that bear upon the appropriate sentence[, see N.J.S.A. 2C:44-1(a),] as well as those mitigating factors[, see N.J.S.A. 2C:44-1(b),] that are 'fully supported by the evidence.'" State v. Blackmon, 202 N.J. 283, 296-97 (2010) (quoting State v. Dalziel, 182 N.J. 494, 505 (2005)).

Under the persistent offender statute, N.J.S.A. 2C:44-3(a), a sentencing court has "discretion to impose an extended sentence when the statutory prerequisites for an extended-term sentence are present." Pierce, 188 N.J. at 161. "Pursuant to the persistent offender statute, a court 'may, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime of the first, second or third-degree to an extended term of imprisonment' if the individual is found to be a persistent offender." State v. Hudson, 209 N.J. 513, 526 (2012) (quoting N.J.S.A. 2C:44-3).

As to consecutive sentences, at the outset, we observe that for the charges set forth in Counts 2 and 4, imposition of sentences that are consecutive to the underlying charge is mandatory. N.J.S.A. 2C:28-5(e). Defendant acknowledges this fact, and only contends that the two charges while necessarily consecutive to Count 1, should have been concurrent to each other, resulting in a sentence of twenty years instead of twenty-four. We disagree.

Certain well-established guidelines govern a trial court's decision to impose consecutive sentences. These considerations are as follows:

> (1) [T]here can be no free crimes in a system for which the punishment shall fit the crime;
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
> (a) [T]he crimes and their objectives were predominantly independent of each other;
> (b) the crimes involved separate acts of violence or threats of violence;
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
> (d) any of the crimes involved multiple victims;
> (e) the convictions for which the sentences are to be imposed are numerous;
> (4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense.

[State v. Cuff, 239 N.J. 321, 347-48 (2019) (third alteration in original) (quoting Yarbough, 100 N.J. at 643-44).]

When a trial court imposes a consecutive sentence, "[t]he focus should be on the fairness of the overall sentence." State v. Abdullah, 184 N.J. 497, 515 (2005) (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

Applying those factors, "a sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences," State v. Carey, 168 N.J. 413, 427-28 (2001), but the court must state its reasons for imposing consecutive sentences, State v. Miller, 205 N.J. 109, 129 (2011). If "a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." Ibid. "However, if the court does not explain why consecutive sentences are warranted, a remand is ordinarily needed for the judge to place reasons on the record." Ibid.

Turning first to defendant's contentions about the trial court failing to consider mitigating factors under N.J.S.A. 2C:44-1(b)(3) and (b)(4), we conclude that the court correctly determined that there was no evidence that

defendant acted under a "strong provocation," State v. Jasuilewicz, 205 N.J. Super. 558, 576 (App. Div. 1985) (quoting N.J.S.A. 2C:44-1(b)(3)) (stating that this mitigating factor arises from actions of the victim and not the mental state of the defendant), or that "[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense," N.J.S.A. 2C:44-1(b)(4). A "trial court [is] not . . . required to consider . . . intoxication as a mitigating factor." State v. Setzer, 268 N.J. Super. 553, 567 (App. Div. 1993). "Crimes committed under the influence of alcohol or drugs do not detract from the seriousness of the offense." Id. at 567-68 (quoting State v. Towey, 244 N.J. Super. 582, 595 (App. Div. 1990)). Further, mental illness is to be considered as a mitigating factor only when a "[d]efendant's deficient mental and emotional condition" prevents he or she from "comprehend[ing] that [he or] she had committed a crime that deserved a prison term, or that [he or] she could modify [his or] her behavior based on [the] imprisonment." State v. Jarbath, 114 N.J. 394, 408-09 (1989). The court's decision to not apply these factors was a proper exercise of its discretion.

We reach the same conclusion as to the trial court's imposition of consecutive sentences on the other two counts. The court specifically noted that the Count 2 and Count 4 offenses were separate crimes, committed on separate dates, and

were committed by defendant from separate locations. See State v. Mejia, 141 N.J. 475, 504 (1995) (explaining that the trial court properly sentenced defendant to consecutive terms of imprisonment as the offenses were separate, even though they occurred around the same time and involved the same victim), overruled on other grounds by State v. Cooper, 151 N.J. 326 (1997); State v. Ghertler, 114 N.J. 383, 391-92 (1989) (upholding consecutive sentences because the trial court "had a working familiarity with the [Yarbough] criteria," and because the crimes occurred at distinct times, were independent from each other, and there were multiple victims); State v. Bauman, 298 N.J. Super. 176, 211-12 (App. Div. 1997) (affirming an extended term and consecutive sentences because the crimes were separate and occurred over a three-day period).

Here, as in Mejia, Bauman, and Ghertler, the trial court did not rely on the statutory sentencing factors to determine whether consecutive sentences were warranted. The court clearly placed its findings as to Yarbough factors on the record that warranted the imposition of consecutive terms. The judge carefully considered the appropriate factors and law in determining that consecutive sentences were warranted. We have no cause to disturb the sentence on this basis either.

A-1137-17T3

We also conclude that defendant was properly sentenced in the extended term as to Count 1. We find no merit to his contention that defendant was not adequately notified the State would be seeking enhanced sentencing

A court may sentence a defendant to an extended term of imprisonment, upon application of the prosecutor, if:

> The defendant has been convicted of a crime of the first, second or third degree and is a persistent offender. A persistent offender is a person who at the time of the commission of the crime is [twenty-one] years of age or over, who has been previously convicted on at least two separate occasions of two crimes, committed at different times, when he [or she] was at least [eighteen] years of age, if the latest in time of these crimes or the date of the defendant's last release from confinement, whichever is later, is within [ten] years of the date of the crime for which the defendant is being sentenced.
>
> [N.J.S.A. 2C:44-3(a).]

The trial court must consider a four-part test when determining whether to give defendant an extended sentence. State v. Dunbar, 108 N.J. 80, 89 (1987).

> First, the sentencing court must determine whether the minimum statutory predicates for subjecting the defendant to an extended term have been met. Second, the court must determine whether to impose an extended sentence. Third, it must weigh the aggravating and mitigating circumstances to determine the base term of the extended sentence. Finally, it must determine whether to impose a period of parole ineligibility.

[Ibid.]

Where a prosecutor fails to specifically identify in a motion the count that it seeks sentencing in the extended term, if at sentencing, he or she clarifies the count to which the motion applied, no error is committed. See Thomas, 195 N.J. at 436-37 (approving the oral clarification but remanding for reasons when the trial court applied the extended term to a different count than requested by the prosecutor). We discern no error warranting any change to defendant's sentence.

IX.

Ineffective Assistance of Counsel

In Point XVI of his supplemental brief, defendant argues that he was provided the ineffective assistance of counsel (IAC) because his attorney never sufficiently challenged the indictment based on the "the fact that multiple counts failed to charge offenses," numerous errors in the verdict sheet and the jury charges, the illegal search of defendant's apartment, that he "unknowingly waived certain rights" because of defendant's actions, and that defense counsel's requirement that defendant pay certain fees put him under duress.

We conclude that the claims defendant raises in this argument are better left to a petition for post-conviction relief (PCR). R. 3:22-1. "Our courts have expressed a general policy against entertaining [IAC] claims on direct appeal

because such claims involve allegations and evidence that lie outside the trial record." State v. Castagna, 187 N.J. 293, 313 (2006) (quoting State v. Preciose, 129 N.J. 451, 460 (1992)). A PCR proceeding would "provide[ a better] developed record upon which to evaluate defendant's claims" as the present record is insufficient for that purpose. Ibid.

X.

To the extent we have not specially addressed any of defendant's remaining arguments, including those in Points VII, XII, and XV of his supplemental brief, we conclude they are without sufficient merit to warrant discussion on a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1137-17T3